**STATE LIFE INS. CO. v. CUMPTON.***

**CUMPTON v. STATE LIFE INS. CO.**

Nos. 4382, 4383.

Court of Appeal of Louisiana. Second Circuit.

Dec. 16, 1932.

Tobin R. Hodge, of Rayville, for appellant.

Warren Hunt, of Rayville, for appellee.

PALMER, J.

On November 3, 1930, Lem Scott Cumpton of Rayville, La., made application to the State Life Insurance Company of Indianapolis, Ind., for a policy of insurance on his life in the sum of $2,000. He signed the application, answering all questions contained therein. He also submitted himself to the company's doctor for a physical examination, after which the doctor made his report thereon to the company. Based on this application and the doctor's report, the life insurance company, on November 21, 1930, issued its policy No. 434402, insuring the life of said Cumpton in the sum applied for, in which policy Mrs. Lula Mae Cumpton, wife of the insured, was named, the beneficiary.

Under the terms of the policy, if the insured, while the policy and disability provisions were in force, became totally disabled as therein defined, due to bodily injuries or disease, before reaching the age of 60 years, and that such disability continued uninterruptedly for a period of not less than four months, the company obligated itself, subject to certain stated conditions, to waive payment of all premiums becoming due after the commencement and during the continuance of such total disability, and, in addition, to pay to the insured an income of $20 per month for the fourth and each subsequent completed month of such continuous disability so long as the insured lives and remains so disabled.

In suit No. 4383, Lem Scott Cumpton sues to recover the sum of $20 per month beginning with the fourth month from the date of certain alleged injuries which he claims rendered him totally disabled. He alleges that on December 26, 1930, while he was at work on the construction of a certain building, he accidentally fell from the building, striking his head on a large timber and fracturing his skull at or near the base, as a result of which he has become totally and permanently disabled from doing any kind of work, and hence is entitled to collect the said income of $20 per month so long as he remains so disabled.

Defendant, State Life Insurance Company, excepted to the petition on the grounds that it does not disclose a cause or right of action. In the same document, with full reservation of all its right under this exception, defendant pleaded prematurity on the ground that, in plaintiff's application for the policy, he waived all his rights to prevent any physician who may have treated him or prescribed for him, testifying concerning such treatment, and that after receiving from plaintiff purported proof of injury, it requested him to sign a prepared letter to the Veterans' Bureau asking them to give defendant full details concerning the diagnosis made by their medical representatives of plaintiff's case, and that plaintiff refused to sign the letter for informa-

tion defendant was entitled to before passing upon plaintiff's claim in that suit.

The exception of no cause or right of action was overruled by the lower court. The record is silent as to any direct ruling on the plea of prematurity.

With full reservation of all its rights under these exceptions, defendant answered, admitting the issuance of the policy sued on and that it contained the provisions to pay an income of $20 per month if plaintiff should become totally disabled from bodily injuries or disease, but it denies plaintiff's alleged injuries and disability. It further denies that notice of injury was given as required by the terms of the policy. Defendant then alleged that the policy was issued on false representations of plaintiff, rendering the policy null and void and that it has filed a separate suit to cancel it.

In suit No. 4382 the State Life Insurance Company sued Lem Scott Cumpton to cancel the said policy and alleged that defendant secured the policy upon knowingly making false answers in his signed application to certain questions dealing with material matters. It further avers that in the said application certain questions were asked defendant to which he made false answers, as follows:

"Have you ever had any illness not mentioned above?" To which he answered, "Yes, fracture of rib in 1917, duration seven days, result good." And, "Have you ever had or been advised to have a surgical operation?" To which he answered, "Yes, small silver plate in top of skull, ¾ in. by ¼ in., in 1917, duration 7 days, result good." And, "Give name and address of every physician or practitioner whom you have consulted or who has treated you during the past five years?" To which he answered, "None." And, "Have you ever had tuberculosis?" To which he answered, "No." And, "Have you ever received indemnity for injury or illness?" To which he answered, "No." And, "Have you ever had or been treated for any disease or disturbance of the lungs or chest?" To which he answered, "No."

Plaintiff then alleges that defendant, at the time he answered the said questions, was applying for compensation from the United States government for injuries claimed to have been received in or connected with service in the United States Army; and that at the same time defendant knew that he previously had an injury to his head and a depression of the skull and that there was no silver plate in his skull; and that defendant, at that same time, also knew that he had been receiving hospital treatment during five years from the United States government and from other physicians; and that he also knew at the same time that, when he was discharged from the United States Army, he had inactive tuberculosis, and that he was in fact at the time of signing the application for this

policy, receiving $25 per month, beginning July 3, 1930, from the United States government as connected disability of "tuberculosis, chronic pulmonary, inactive," and that he was classed before the policy issued as permanently partially disabled to the extent of 25 per cent.; and that he knew at the same time he had had tuberculosis.

The defendant pleaded a general denial of plaintiff's charges. However, he admitted the questions were asked as alleged and that he answered them as alleged, but averred that such answers were true answers.

As a matter of fact, plaintiff raised the issue of tuberculosis in an amended petition filed December 12, 1931, after defendant had filed, on December 5, 1931, its answer to the original petition. The record does not show any answer to the allegations in the amended petition, however, defendant offered his proof of denial, which was received without objection, hence we shall construe the answer so as to not only deny allegations of the original petition, but also the allegations of the amended petition.

In suit No. 4383, which is the case of Lem Scott Cumpton v. State Life Insurance Company, the lower court rendered judgment in favor of plaintiff in the sum of $20 per month, beginning March 26, 1931, and to continue as long as he remains totally and permanently disabled, defendant to pay all costs of the suit. In suit No. 4382, entitled State Life Insurance Company v. Lem Scott Cumpton et al., in which Cumpton's wife, as the beneficiary under the policy, was a party defendant, the lower court rendered judgment in favor of the defendants, dismissing plaintiff's suit at its cost.

From these judgments, State Life Insurance Company prosecutes these appeals.

### Opinion.

Perhaps the orderly procedure for the court to follow in considering these cases is to first determine the issues in the case of State Life Insurance Company v. Lem Scott Cumpton, No. 4382, because any recovery Lem Scott Cumpton seeks against State Life Insurance Company in suit No. 4383, entitled Lem Scott Cumpton v. State Life Insurance Company, is dependent upon a favorable decision to him, holding that the policy involved is valid.

There appears to be no dispute that the following facts exist: That on October 20, 1921, Lem Scott Cumpton filed a claim for compensation with the United States Veterans' Bureau at New Orleans, based upon "enlarged bronchial tubes," which he attributed to influenza and pneumonia sustained in the United States Army Service. On December 30, 1931, Cumpton received a reply from a letter he had written the Veterans' Bureau concerning his physical condition, in which letter the bureau advised him the records of that office disclosed that under date of June

19, 1930, his disability of "tuberculosis, chronic, pulmonary, inactive, apparently cured" was considered to be of a noncompensable degree, having less than 10 per cent. from time of discharge, and that his disability of "bronchitis, chronic" was considered not having been incurred in or aggravated by military service. In that same letter the bureau said: "The records further show that an award of compensation was authorized in your behalf under date of May 1, 1931, allowing you compensation retroactively from July 3, 1930, based upon your lung disability of 'tuberculosis, chronic, pulmonary inactive, apparently cured.' "

The record also contains an affidavit of B. C. Moore, regional manager of the veterans' administration for the state of Louisiana, dated February 9, 1932, in which he says:

"I have carefully reviewed the entire file of compensation filed by Lem Scott Cumpton of Rayville, Louisiana. This file reveals the following information:

"That the veteran was enlisted in the services of the United States Army on February 20, 1918, and was honorably discharged April 1, 1919, and that from February 11 to March 26, 1919, this veteran was under observation for tuberculosis at the Army Hospital No. 19, Oteen, N. C. The result of this observation being negative for tuberculosis.

"That the records further indicate that this veteran has never been hospitalized by the Veterans' Administration or the United States Veterans' Bureau for the treatment of tuberculosis or any other disease.

"And that the veteran's first compensation check was issued the sixth day of May, 1931, based upon the physical examination of April 1, 1931, by the Regional Office of the United States Veterans' Bureau at New Orleans, Louisiana. No previous compensation payments having been made to this veteran. The above award of compensation was effective July 3, 1930, and was payable on a diagnosis of tuberculosis, arrested, apparently cured. This veteran has never had a diagnosis of active tuberculosis made by the U. S. Veterans' Bureau since his discharge from the Army."

On November 28, 1931, F. Martinez, Jr., acting regional manager of the United States Veterans' Bureau at New Orleans, after giving the title as "Cumpton, Lem Scott, C—1 129 266," issued a general letter addressed "To Whom It May Concern," as follows:

"The records in this office disclose that the above captioned ex-service man is currently receiving $25.00 per month compensation, for an arrested respiratory disability. The initial payment in his claim, in the amount of $248.39, was approved by authority of the Director, under date of May 6, 1931,

"Prior to the amendment to the World War Veterans' Act of July 3, 1930, the respiratory condition described above was considered as no per cent (0%) disabling. However, under the Act of July 3, 1930, the condition was considered as compensable."

The testimony of Lem Scott Cumpton, which is not disputed, further shows that, when he went to the army hospital at Oteen, N. C., in February, 1918, he was sent there by the army camp where he was located at the time. It is undisputed that he was there under observation for tuberculosis, but that the result of that observation was negative for tuberculosis. Cumpton denies that he had any knowledge of the causes that carried him from the army camp to Oteen. His position is that the army officers directed him to go and he complied with orders. In fact, Cumpton denies that he ever had any knowledge of having tuberculosis, and, as far as his examination at Oteen is concerned, he is supported in that idea. It is clear from the affidavit of B. C. Moore, supra, that Cumpton was never hospitalized by the Veterans' Administration or the United States Veterans' Bureau for the treatment of tuberculosis or any other disease. It is a fact, however, that on May 1, 1931, an award allowing Cumpton compensation retroactively from July 3, 1930, based upon lung disability, was made. However, the same affidavit of B. C. Moore, supra, states that the award of compensation in May, 1931, was based upon a physical examination of Cumpton on April 1, 1931, by the regional office of the United States Veterans' Bureau at New Orleans, and that no previous compensation had been made to Cumpton. This award was made retroactive to July 3, 1930, because of a new federal statute making that course possible. This is made clear by the general letter of acting regional manager, F. Martinez, Jr., supra. It will be noted, therefore, that no compensation was received by Cumpton from the Veterans' Administration or the United States Veterans' Bureau until the 6th day of May, 1931, which was, as above stated, based on a physical examination of April 1, 1931. The record clearly establishes the fact that on November 3, 1930, when plaintiff filed his application for this policy, and even on November 21, 1930, when the policy was issued, Cumpton had never been hospitalized by the Veterans' Administration or the United States Veterans' Bureau for the treatment of tuberculosis or any other disease. It further shows that at that time Cumpton was not receiving any compensation from the Veterans' Bureau and did not receive any until after his physical examination on April 1, 1931. It is a fact, however, that Cumpton, under date of October 20, 1921, filed a claim for compensation with the United States Veterans' Bu-

reau, based upon "enlarged bronchial tubes," but he attributed this condition to influenza and pneumonia. He appears not to have had any further contact with the Veterans' Bureau until his examination on April 1, 1931, although it does appear that on June 19, 1930, the bureau rejected compensation on the grounds of "tuberculosis, chronic, pulmonary, inactive, apparently cured," for the reason that it was considered to be of a noncompensable degree, having less than 10 per cent. from the date of Cumpton's discharge from the service, which the record shows occurred at Shelby, Miss., on the 1st day of April, 1919. In other words, so far as this record goes, after Cumpton, on October 20, 1921, filed a claim for a compensation with United States Veterans' Bureau, no action was taken until June 9, 1930, at which time compensation was disallowed for the reasons just stated.

As to whether or not Cumpton had tuberculosis at all is, to say the least of it, lodged in the realm of doubt. Dr. A. Street of Vicksburg, one of the owners of the Vicksburg Sanitarium, who treated Cumpton for his injuries involved in suit No. 4383, stated that as a result of his examination he did not find Cumpton affected with such trouble. Dr. Street began treating Cumpton in April, 1931. Furthermore, on February 19, 1932, L. V. Lopez, Md., regional medical officer of the Veterans' Administration at New Orleans, in reply to a letter from Cumpton, stated that the last examination given Cumpton in the regional office was September 11, 1931, with the following result:

"Special lung examination, same date, by Dr. E. J. Beranger, revealed Emphysema, moderate; Bronchitis, chronic, moderate; Bronchial asthma, moderate,

"X-ray of lungs revealed—Heart and aorta normal; size, shape and position; Diaphragms smooth and rounded; hilar shadows moderately thickened; peripheral and apical lungs clear; parenchymatous lungs show moderate generalized fibrosis.

"A special lung examination conducted on you in this office April 1st, 1931, revealed Bronchitis, chronic, moderate."

This same letter further contains the following statement: "X-ray of lungs April 1st, 1931, revealed heart and aorta normal in size, shape and position; hilar shadows thickened with calcification; peri bronchial shadows well definited; parenchymatous lungs show moderate fibrosis."

Summarizing the evidence on the question of tuberculosis, we have, as we appreciate it, the following situation: Cumpton, in February, 1919, was sent by the army officers of the camp in which he was located to Oteen, N. C., for observation for tuberculosis, and was at that institution from February 11th to March 26th. The result of that observation was negative for tuberculosis. Also on October 20, 1921, Cumpton filed a claim for compensation with the United States Veterans' Bureau at New Orleans, based upon "enlarged bronchial tubes," which he attributed to influenza and pneumonia sustained in the service. It appears that the only definite consideration given Cumpton at all concerning tuberculosis prior to the application for the policy in this case, and the issuance of it, was the fact that he was sent to Oteen in February, 1919, for observation for tuberculosis, which examination proved negative. Cumpton denies that he knew what he was at that institution for, even if he had, he could have hardly had a higher authority for forming a belief that he did not have tuberculosis than the report of that observation given him in that institution that specializes in that work.

■■ It occurs to us that Cumpton endeavored to be fair and honest in his answers to the questions propounded to him in his application for this policy. Apparently he did not hesitate to disclose a skull fracture which he had in the top of his head. It is true he stated that it had a small silver plate in it, which the X-ray failed to sustain. But his evidence shows that it was his belief that such a plate was placed there. At any rate, we are convinced he attempted to honestly disclose that condition. As to whether or not he had consulted any physician during the past five years, the evidence does not show that his negative answer to that question was false. As we have already shown, the connection he was having with the Veterans' Bureau, except when he applied for compensation in 1921, did not start until after he had received this policy of insurance. Whatever illness, if any, he had had in the meantime was evidently of a minor nature and certainly not such as would make him guilty of falsifying when he answered that the illness he had had, other than those mentioned in the questions, was a fracture of a rib in 1917.

As we appreciate it, the only real material issue presented in this controversy is the question as to whether or not Cumpton knowingly had tuberculosis or knowingly had been treated for lung trouble at the time he applied for and obtained this insurance policy. We are not convinced that he ever had tuberculosis, but even if he had, we are not convinced that he ever knew it.

We come now to a consideration of the issues raised in suit No. 4383, entitled Lem Scott Cumpton v. State Life Insurance Company.

Before discussing the case on its merits, we will pass on the exceptions of no cause or right of action and of prematurity, filed by the State Life Insurance Company.

Exception of No Cause or Right of Action.

█ It is contended that the exception of no cause or right of action is leveled at the fact that Cumpton did not allege that he was wholly prevented from following, not only the work he was engaged in at the time of his injury, but any other business for remuneration or profit. We disagree with counsel's contention. In plaintiff's paragraph 5, among other things, he alleged that, as a result of his injuries, he "has become totally and permanently disabled from doing any kind of work." We think these allegations sufficiently charge that he was prevented from following any business for remuneration or profit. The trial court correctly overruled this exception.

Exception of Prematurity.

█ This exception is based on the ground that in plaintiff's application for the insurance he waived his rights to prohibit any physician or other person who may have prescribed for him from testifying regarding his health, habits, etc.

It is true, while on the witness stand, Cumpton told counsel that he would not sign an order to the Veterans' Bureau asking them to furnish information concerning his condition, but he stated that his reason for doing this was because he had already secured all such facts from the bureau by letters, and that they had been filed, or tendered to counsel for filing, in the case. In our view, however, this is immaterial because in plaintiff's application he expressly waived this very right that he was asked to waive by signing a special letter to that effect. In other words, the application gave the insurance company the right, so far as Cumpton was concerned, to procure that information and no further waiver was necessary on his part. Had he given any other it would have been merely culminative, so this exception is without merit.

On the Merits.

We may better express plaintiff's claim for $20 per month income sued for in this case by quoting from his testimony:

"Q. Mr. Cumpton, in your petition here against the State Life Ins. Company, you allege that on the 26th day of December 1930, while at work on the construction of a building in Richland Parish, that you accidentally fell and sustained an injury from which you have been totally and permanently disabled for any kind of work? A. Yes, sir.

"Q. Please state how this accident occurred and where? A. I had started upon the framing there of the teacher's cottage at Mangham and there were some fellows holding some frames off to one side and they hollered for help, and I hollered to the boys to come and give them a lift and had started to them, and something flew in and hit me as I started and I fell in the bath room head foremost.

"Q. Were you knocked unconscious by the fall? A. Yes, sir.

"Q. How long were you unconscious? A. I reckon thirty or forty minutes before I recognized a man; I couldn't stand up until after that.

"Q. Since receiving that injury, what has been your physical condition? A. I haven't had any.

"Q. Have you been able to work? A. No, sir.

"Q. Why? A. I just ain't able to do nothing.

"Q. What is your condition? A. Well, my head and I am weakened all over; I am just knocked completely out.

"Q. Since that injury do you have any kind of dizzy spells? A. Yes, sir.

"Q. What kind of spells is it you have? A. Well, whenever a pain strikes me in the head I just go blind and it seems like all my muscles just quiver.

"Q. Are you in a nervous tension and condition all the time? A. On the right side, yes, sir.

"Q. Now, that injury was to your head? A. Yes, sir.

"Q. Before receiving that injury, what was your physical condition? A. I didn't know what a sick day was."

Cumpton says he was a carpenter foreman prior to this accident, in which work he was engaged at the time he was injured. He said that he did not know how to do any other kind of work unless it be to farm, and that on account of his present physical condition he could not now do that. He said that he had his first spell from this injury about three weeks later. In answering a question of his counsel as to how he was affected when he had these spells, he said:

"A. * * * the best I can tell you, when I exert myself a little too much,—well I noticed on one occasion an excitement affects me, and I just have dizzy, blind spells, and temporarily I am just like I am knocked on the head, and maybe sometimes it will last thirty minutes, and I have been unconscious nine hours from it.

"Q. What is your condition following these falling out spells? A. Well, I just relax all over and quiver, just like my nerve is all gone or something.

"Q. Do you usually lapse into a sleep? A. Yes, sir. I rest fairly good for an hour or two.

"Q. How long, as a general rule, do you sleep after having one of those spells? A. Probably an hour or so."

Dr. Street, one of the owners of the Vicksburg Sanitarium at Vicksburg, Miss., testified

that he commenced to treat Cumpton on April 9, 1931, at which time Cumpton was suffering from attacks which he considered to be epileptic. He stated that Cumpton gave him a history of his case and that, regardless of the failure of the X-ray to show the fracture at the base of the skull, he was positive that Cumpton had such a fracture. He said that he made a diagnosis of the case as epilepsy; said he did not attempt to classify the epilepsy, but other doctors classified it as Jacksonian epilepsy. Dr. Street said that in his opinion Cumpton is totally disabled for doing manual labor, which disability he thinks is permanent.

Dr. J. C. Sartor attended Cumpton after his injury on December 26, 1930, and has continued to treat him since. He said he treated him for what he thought to be Jacksonian epilepsy; said he made this diagnosis on the symptoms he found; that is, extreme nervousness and dizziness, weakness and chronic spasms of the muscles, and temporary blindness. He said he had never seen him in the beginning of one of his spells, but had seen him immediately afterward. In discussing the symptoms of Jacksonian epilepsy, Dr. Sartor said: "It usually comes on without warning. Jacksonian epilepsy differs from ordinary epilepsy in that you usually have, in the beginning, just one group of muscles involved, say one side; or the arm muscles will begin twitching."

He said that the condition Cumpton has could have been produced by the injury to Cumpton now in question. He says Jacksonian epilepsy usually follows from brain injury. He says in his opinion Cumpton is totally and permanently disabled.

Dr. H. C. Chambers, sworn on behalf of the State Life Insurance Company, said that during his practice of twenty years he had had occasion to treat or see many people afflicted with epilepsy. He said epilepsy in its true sense is more severe than what is known as Jacksonian epilepsy; that he has, in the vicinity in which he practices medicine, about four patients suffering from Jacksonian epilepsy; that when they were not in one of these seizures they can do anything they want to; that the time of seizure varies with the individual patient, as some might have a spell every day and others might not have more than one or two a year. He said he would consider an epileptic a normal person when he is not suffering from a seizure of epilepsy, as they continue their regular labors when they are not in one of those epileptic seizures. He said that he had treated Cumpton professionally in March, 1931, at which time he was suffering severe pains in the side of his head, which was attributed at the time to draining of his sinuses. Dr. Chambers said he did not

at that time have anything that appeared to be an epileptic attack. He said that he knew Dr. Street of Vicksburg and considered him one of the best in this section of the country. He stated that there is nothing one can give a patient with epilepsy that will help. He further stated that he knows Cumpton and does not believe that he could walk into a doctor's office and play the part of an epileptic so as to deceive the physician. He said he thinks in order to determine whether Cumpton has Jacksonian epilepsy it would be necessary to give him an observation for a period of time; that he does not believe Cumpton could feign the symptoms of a Jacksonian epileptic and explain them to a doctor so as to mislead him to the extent of improperly calling it Jacksonian epilepsy.

The lay testimony shows, in substance, that Cumpton knocks around, rides in an automobile, and sometimes drives one. It is contended by the insurance company that on one occasion since the injury Cumpton drove a car to New Orleans and drove through the congested traffic in that city. This is disputed by Cumpton. The facts do show, however, that much of his travelling in an automobile is when his wife is at the steering wheel.

There is no effort by the insurance company to show that, prior to this injury, Cumpton had not been an industrious workman. In other words, there is nothing in the record to suggest that he would be likely to malinger. In this case, under the terms of the policy, Cumpton can receive the small sum of $20 per month during the time he suffers from total disability. If he is a lazy man and given to malingering, we can see how he could falsely assume such an attitude in order to collect that small sum, but since he appears to be industrious and willing and ready to work, and, since he can only receive this small income during his total disability, we cannot conceive of such a man malingering to receive such a small sum at such a great cost.

■ Only questions of fact are raised in this case. The district judge held that these facts established the contention of plaintiff, Lem Scott Cumpton, and we do not find that there is any manifest error in such conclusions.

It is therefore ordered, adjudged, and decreed that in case No. 4382, State Life Insurance Company v. Lem Scott Cumpton et al., the judgment of the lower court is affirmed, appellant to pay all costs of appeal.

It is further ordered, adjudged, and decreed that in case No. 4383, entitled Lem Scott Cumpton v. State Life Insurance Company, the judgment of the lower court is affirmed, appellant to pay all costs of the appeal.