## WERNER v. STATE LIFE INSURANCE COMPANY OF INDIANAPOLIS.

[No. 15,321. Filed March 5, 1937. Rehearing denied June 16, 1937. Transfer denied October 4, 1937.]

*Fenton, Steers, Beasley & Klee* and *Arthur J. Sullivan,* for appellant.

*Milton W. Mangus, Charles F. Coffin,* and *Joseph A. McGowan,* for appellee.

DUDINE, J.—This is an appeal from a judgment for appellee (defendant below) in a suit instituted by appellant, the beneficiary of two life insurance policies issued by appellee, to recover on the double indemnity provision of the policies.

The complaint was in two paragraphs, one for each policy. The paragraphs were identical except as to the amounts of insurance provided by the respective policies. A demurrer to each of said paragraphs of complaint was filed and sustained, and appellant declining to plead further, judgment was rendered in favor of appellee. On appeal the sole error relied upon for reversal is alleged error in sustaining each of said demurrers.

The policies were dated February 16, 1921. They contained an "incontestability clause" which provided that the policy "shall be incontestable after one year from date hereof, except for non-payment of premiums."

The double indemnity clause of the policies was as follows:

"During the premium paying period of this Policy, and excluding any time while the same may be in force as extended insurance, all premiums having been duly paid, and this Policy being then in force, in the event of the death of the insured, resulting from bodily injury, sustained and effected directly through external, violent and accidental means (*murder or suicide, sane or insane, not included*), exclusively and independently of all other causes, provided such death shall occur within ninety (90) days from the date of the accident, the Company will pay to the beneficiary or beneficiaries hereunder, in addition to the amount otherwise due, under this Policy, . . ." (Our italics.)

The complaint alleged among other things:

". . . that on or about the 4th day of August, 1932, and while said policy was in full force and effect, and there being no indebtedness due on said policy in favor of the defendant, the insured, Jacob Werner, died as the result of bodily injuries sustained and effected directly through external, violent, and accidental means, and not by murder or suicide, exclusively and independently of all other causes, in the following manner to-wit: that on the 2nd day of August, 1932, said insured, while in his

office and place of business as a pawn broker at 234 Indiana Avenue, in the city of Indianapolis, Indiana, all without any fault or provocation on his part, was held up, beaten about the head and body and robbed and shot by a gun, through the epigastrium, transverse colon, duodenum and abdominal wall, from all of which injuries he died from gunshot wounds two days later, to-wit, on the 4th day of August, 1932, at the Riley Hospital in the city of Indianapolis, Indiana."

Appellant's points may be summarized as follows: (1) The facts alleged in the complaint show that the insured's death "resulted from bodily injury, sustained and effected through external, violent and accidental means" within the meaning of said terms as expressed in said double indemnity clause.

Stated adversely, appellant contends that the facts alleged in the complaint do not show that insured's death resulted from "murder or suicide, sane or insane," within the meaning of said terms as expressed in said double indemnity clause.

(2) Regardless of whether or not insured's death is shown by the allegations of the complaint to come within the provisions, or exceptions to the provisions of said double indemnity clause, the incontestability clause and Sec. 39-801, paragraph 3, Burns 1933 (§9723 Baldwin's 1934), permits a recovery on the policies, they having been in force more than two years at the time of insured's death, and premiums being fully paid at that time.

Sec. 39-801, p. 3, Burns 1933 (§9723 Baldwin's 1934), *supra,* provides:

"From and after July 1, 1909, no policy of life insurance shall be issued or delivered in this state or be issued by a life insurance company organized under the laws of this state, unless the same shall provide the following . . .

"(3) That the policy . . . shall be incontestable after it shall have been in force during the lifetime

of the insured for two (2) years from its date, except for non-payment of premium and except for the violation of the conditions of the policy relating to naval or military service in time of war."

It will be readily seen that the policies in the instant case complied with the provisions of Sec. 39-801 Burns 1933 (§9723 Baldwin's 1934), *supra,* insofar as contestability for non-payment of premiums is concerned.

We will first discuss the contention that insured's death, as alleged in the complaint, was covered by the double indemnity clause, and was not excluded by the exceptions to the provisions of the double indemnity clause.

Appellant states sixteen points in support of said contention, the first fifteen of which support the proposition that where an insured is murdered without fault or provocation on his part his death is "accidental" within the meaning of insurance policies covering accidental death. Many cases are cited in support of said points, including the following Indiana authorities: *Supreme Council, etc.* v. *Garrigus* (1885), 104 Ind. 133, 3 N. E. 818; *Phoenix Acc. and Sick Benefit Assn.* v. *Stiver* (1908), 42 Ind. App. 636, 82 N. E. 772; *Travelers Protective Assn.* v. *Fawcett, Gdn.* (1914), 56 Ind. App. 111, 104 N. E. 991.

We agree with said proposition, but if it be assumed that insured's death was an "accidental" death, which we do not decide, we must still determine whether it was excluded as a risk. (See *Barham* v. *The State Life Insurance Co.* (1931), 17 La. App. 253, wherein the court was discussing the identical double indemnity provision involved here, and the court said (p. 254) :

"The meaning of the exception of murder and suicide is that if death was caused by accidental means, it was liable except where death was caused by suicide or murder."

Appellant's sixteenth point is "when an insurance contract contains conflicting provision, or is otherwise ambiguous, it will be strictly construed against the insurer and that construction will be adopted which will sustain rather than defeat the purpose of the contract, if it can be done without doing violence to the language used when fairly construed in the light of the situation of the parties." Appellant cites *Masonic Acc. Ins. Co.* v. *Jackson* (1929), 200 Ind. 472, 164 N. E. 628; *Fletcher Savings and Trust Co.* v. *American Surety Co.* (1931), 92 Ind. App. 651, 175 N. E. 247, in support of said point.

We recognize said rules of construction, but they are not applicable here.

We hold that the policies in the instant case expressly and clearly exclude death by murder from the risks covered by the double indemnity clause. The facts alleged as to insured's death constituted murder within the meaning of the statutes in effect when the policy was issued (Feb. 16, 1921), Sec. 347, Ch. 169, Acts 1905 (p. 660), and within the meaning of the statutes in effect at the time when insured was killed, August 4, 1932, Sec. 4, Ch. 54, Acts 1929 (p. 137). Therefore we hold that the complaint alleges facts which show that insured's death was not covered by the double indemnity provision of the policies.

Appellant has cited numerous authorities in support of the contention that the incontestability clause and Sec. 39-801 Burns 1933 (§9723 Baldwin's 1934), *supra,* permits a recovery on the policy in spite of the exceptions in the double indemnity clause "murder or suicide, sane or insane, not included."

Some of them are cases in which the court was considering the effect of incontestability clauses, with reference to preventing contests as to facts existing at the time the respective policies were issued, and where the

Appellate Court used broad language, to the effect that the incontestability clauses cut off "all" defenses. One of such cases is *Indiana Nat'l Life Ins. Co.* v. *McGinnis* (1913), 180 Ind. 9, 101 N. E. 289, wherein the court said (p. 16) :

> "It seems to be a well recognized principle of insurance law that a provision in a contract of insurance limiting the time in which the insurer may take advantage of certain facts that might otherwise constitute a good defense to its liability on such contract, is valid and precludes every defense to the policy other than the defenses excepted in the provision itself."

It should be noted that the court in that case was considering the question of whether or not the incontestability clause in the policy before the court prevented a contest by the insurance company on the ground that statements and warranties in the application for insurance were untrue; and that the court did not have before it for determination the effect of the incontestability clause as to any other defenses. The statement of the court above quoted is dictum insofar as it purports to decide questions which were not before the court.

The instant case should be distinguished from cases in which the court determined the effect of incontestability clauses with reference to preventing contests based on misrepresentation or fraudulent concealment of facts in the applications for insurance, because such contests attack the validity of the contract, while in the instant case the validity of the contract is not attacked, but on the contrary appellee admits the validity of the contract. Here it is merely insisted by appellee that the contract be not construed to cover risks which are not covered by the contract.

This case should also be distinguished from cases in which insurance companies attempt to set up a defense of suicide, under the terms of policies which purport-

edly exclude suicide from the risks covered, wherein the appellate courts, relying on statutes which specifically prevent the defense of suicide, held that suicide could not be set up as a defense. See *Aetna Life Ins. Co.* v. *Wertheimer* (1933), 64 Fed. (2d) 438, involving Utah Statute; *Aetna Life Ins. Co.* v. *Brankman* (1934), 70 Fed. (2d) 647, involving Colorado .Statute; *Iowa State Traveling Men's Assn.* v. *Ruge* (1917), 242 Fed. 762, involving Missouri statute. There is no such statute in Indiana.

Appellant cites one Indiana "suicide case," to wit, *Court of Honor* v. *Hutchens* (1908), 43 Ind. App. 321, 82 N. E. 89. In that case one Hutchens applied for membership in a fraternal insurance association. His application for membership provided "that this order shall not be responsible under this contract . . . if I shall die . . . by suicide . . ."

The constitution of the order, at the time his certificate of membership was issued, provided: "After two years certificates of membership shall be incontestable for any cause except fraud, violation of the constitution or laws of this order or a failure to pay the assessments for the benefit and general fund as provided by the laws."

This court held that the incontestability clause prevented the association from setting up the defense of suicide, after the two-year contestability period expired.

That case does tend to support appellant's contention, but it should be noted that this court did not express any reasoning by which it arrived at that conclusion. In that respect this court merely said, "After the expiration of the two years specified in said article of the constitution said certificate became incontestable for any cause except those specified therein, and the defense of suicide was, after such period, no longer available." No

authorities are cited by the court in support of said conclusion. It is simply a decision as to that question as presented by the facts of that particular case. The facts in the instant case, being materially different, said case is not controlling here.

We think cases where incontestability clauses are held to prevent defenses of suicide after the period of contestability expires should be distinguished from cases, like the instant case, where an incontestability clause is relied upon against a defense of murder, because of the difference in the risks assumed by insurance companies when they insure against suicide or murder.

Sometimes suicide is the result of irresponsibility on the part of the suicide, the result of physical or mental frailty on his part. In such cases suicide bears a similarity to diseases or ailments which cause death, insofar as the life insurance risk on such person is concerned. There are, however, cases where suicide is premeditated. This situation has caused insurance companies generally, so far as the face of life insurance policies are concerned, to avoid liability in case of suicide within a reasonable time, e. g., one year, and thus prevent a person who is planning to commit suicide from taking out life insurance and subjecting the insurance company to liability by carrying out their preconceived plan of committing suicide. They guard against such risks for a reasonable time only, because they assume that a person will not plan, for an unreasonable length of time, e. g., more than one year, to commit suicide, in connection with a plan to take out life insurance and enable beneficiaries to collect on the policy.

This idea is adversely and more clearly expressed in *Mutual Protective League* v. *McKee* (1905), 122 Ill. App. 376, wherein the effect of an incontestability clause was being discussed in the following language (p. 379):

"Under this contract the deceased was not required to understand, that if after two years of faithful membership and payment of assessments, he should, for instance, fall insane and die by his own hand that the important incontestable clause in his contract would be unavailing to his beneficiary. He was warranted in understanding, as any sensible man might, that to meet this possible contingency was one of the principal causes for having such a clause in the contract. Fixing a future time, say two years as in this case, guards against the premeditated fraud which sometimes exists, of having one's life insured in contemplation of suicide."

Such argument is not available in support of the contention that incontestability clauses generally prevent "murder defenses."

The effect of an incontestability clause, similar in effect to that in the policies before us, with reference to a defense of death resulting "from bodily injury inflicted by another person," is aptly expressed in *Sanders* v. *Jefferson Standard Life Ins. Co.* (1925), 10 Fed. (2d) 143. Murder being a death resulting from "bodily injury inflicted by another person," and the incontestability clause involved in that case being similar in effect to that involved in the instant case, the language of the court is applicable to the instant case, due allowance being made for difference in amounts of insurance involved in the respective cases.

The court said in that case (p. 143):

"In behalf of the appellant it was contended that in the situation disclosed the provision that the policy 'shall be incontestable for any cause except for nonpayment of premiums' deprived the insurer of the right to dispute its liability under the 'double indemnity' provision, though by the express terms of that provision it was not to apply 'in case death results from bodily injury inflicted by another person.' We are of the opinion that a result of sustaining this contention would be to subject the insurer to a liability not imposed by its policy. By the policy the insurer promised to pay specified

sums of money in specified contingencies. We think that full effect is given to the above-quoted provisions by holding that, after the policy had been in force for one full year, and in the absence of any default in the payment of premiums, the insurer became incontestably liable to pay $20,000.00, if the insured died from what was called 'ordinary causes,' and became liable to pay also an additional $20,000.00 if the death of the insured resulted from a bodily injury not within any exception stated in the double indemnity provision.

"A provision for incontestability does not have the effect of converting a promise to pay on the happening of a stated contingency into a promise to pay whether such contingency does or does not happen. It cannot properly be said that a party to an instrument contests it by raising the question whether under its terms a liability asserted by another party has or has not accrued. The maker of a promissory note payable one year after date would not contest it by resisting an attempt to enforce it before it was due. We are of opinion that within the meaning of the provision for incontestability, the insurer did not contest the policy by invoking the terms of the double indemnity provision, and that it was open to the insurer to deny the liability asserted on the ground that the contingency in which double indemnity was payable did not occur."

In that case the lower court denied recovery on the double indemnity provision of the policy. On appeal the judgment was affirmed. To the same effect see *Jolley* v. *Jefferson Standard Life Ins. Co.* (1930), 199 N. C. 269, 154 S. E. 401; *Head* v. *New York Life Ins. Co.* (1930), 43 Fed. (2d) 517; *Metropolitan Life Ins. Co.* v. *Conaway* (1930), 252 N. Y. 449, 169 N. E. 642; *Williamson* v. *American Ins. Union* (1936), 284 Ill. App. 150, 1 N. E. (2d) 541.

We hold that a defense based on murder would not be a contest of the policies before us which is prohibited by the incontestability clause. Such a defense would be merely a defense that the double indemnity provision did not cover death by murder, or

that death by murder was expressly excluded from the risks covered by the double indemnity clause.

The complaint—alleging facts which show that insured's death was "by murder," and the insurance policy expressly excluding death by murder from the risks covered by the double indemnity clause—it alleged facts sufficient to constitute a defense to the complaint. Therefore we hold that the court did not err in sustaining the demurrer to the respective paragraphs of complaint. *Knauss* v. *Lake Erie and Western R. R. Co.* (1902), 29 Ind. App. 216, 64 N. E. 95, and cases there cited.

No reversible error having been shown, the judgment is affirmed.

Kime, J. dissents with opinion.

### DISSENTING OPINION.

KIME, J.—Since I am firmly convinced that ruling precedents of the Supreme Court are being violated by the majority opinion in this case it is my duty to state what I conceive the law to be as applied to the facts in this case. In the first place the statute says specifically that all policies should be incontestable after two years except for non-payment of premiums. Conceding that the statute is written into and becomes a part of all policies it follows then that under the statute this policy could be contested only for non-payment of premiums. The Supreme Court and this court have said, many times, that the incontestable statute means *exactly what it says*.

Again this policy is ambiguous and since it is ambiguous such ambiguity must be construed strictly against the insurer where an exception is involved. The majority opinion also says that there is a difference in the risk assumed by the insurer as to suicide and murder and this is absolutely groundless. I will concede that if this was a question as to the coverage intended to be

placed in force or omitted and there was no assumption of risk at all that there could be no liability and that it would be the better rule probably to allow the insurer to defend on the ground that the risk had never been assumed but this is not the situation here, and for a further reason that an identical situation has been decided by this court wherein it was held that one who is murdered without fault on his part, without his expectation and foresight and he did not intend it that it was accidental.

In addition to the fact that the legislature knew exactly what it intended when it adopted the incontestable clause, the accumulation of the cases show that this state has held not only once, but many times that an incontestable clause means that the policy is not to be contested for any purpose except for statutory reasons, contained in the act.

The people of Indiana in 1909 through their legislature in "defining their powers and prescribing their duties" of all life insurance companies "organized under . . . or doing business" in this state said that such policies should contain the following: "that the policy . . . shall constitute the entire contract between the parties and shall be *incontestable* after not more than two years from its date *except* for non-payment of premiums and *except* for violation of the conditions of the policy relating to naval and military service in time of war." The legislature at that time also had all of our language at its command. It used ordinary common everyday words that were familiar to and part of the vocabulary of at least every legislator and every high school student. They decreed, as the supreme law of state, that policies ("entire contract") shall be incontestable after the stated period *except* for non-payment of premiums and except for violation of conditions of the policy relating to certain service in time of war. If

it had been the idea of the legislature that there should have been other *exceptions* it would have been very easy to have added another or other "except for" clauses. The *only* conclusion that can be reached is that it did not want any other exceptions. Nor has any other legislature since that time deemed there was any need for any additional exceptions. And there have been seventeen meetings of that body in those twenty-eight years.

The insurer can, of course, make any contract that its agents can persuade a gullible purchaser to buy. The whole of the English language is at their disposal to be used as they dictate. Most of the words used in insurance policies have been interpreted judicially not once but many times. There is no necessity today for the use of uncertain terms in life insurance. It was because of the use of loose language and the consequent endeavor of the companies to avoid liability thereunder that the Hughes investigation in New York revealed such practice. Realization that some radical measures were necessary caused the better companies and others to write incontestable clauses into their policies and sponsor legislation that would stabilize and revitalize the toppling business of life insurance. One of the outgrowths of this investigation was statutory incontestable clauses. They were enacted first and last to guarantee to the world that thereafter policies upon which premiums were paid could be collected in full and without delay, costly, expensive and exasperating litigation.

In 1887, which is the date of the earliest case I have been able to find in this state, the Supreme Court used language from which the only inference is that the court at that time believed that a policy containing an incontestable clause should be absolutely indisputable for any reason than that contained in the incontestable clause and that the company should never make any other defense under such a clause except for those reasons.

*Kline* v. *National Benefit Association* (1887), 111 Ind. 462, 11 N. E. 620.

In 1896 this court in a case wherein it was being asserted that this clause meant that the insurer was *"precluded from the right to make any defense whatever to the payment of the full amount"* the assumption of the court was that a policy containing such clause was incontestable. (Our italics.) *The Peoples Mutual Benefit Society* v. *Templeton* (1896), 16 Ind. App. 126, 44 N. E. 809.

In 1908, the year before the statute was adopted in this state, this court held that suicide was no defense and that an incontestable clause in the policy prevented the defense from suicide being asserted. *Court of Honor* v. *Hutchins* (1908), 43 Ind. App. 321, 82 N. E. 89.

The Supreme Court again in *Federal Life Insurance Company* v. *Kerr* (1909), 173 Ind. 613, 89 N. E. 398, expressed the idea that the incontestable clause in the policy cuts off the rights of the insurer to contest the policy for any reason other than that excepted to in the incontestable clause.

This court again in 1911 in *Court of Honor* v. *Rausch* (1911), 50 Ind. App. 161, 95 N. E. 1018, said that "after the expiration of two years the defense of suicide became unavailable and the contract of insurance contained in the certificate became *incontestable for any reasons* except those stated in the incontestable clause. . . ."

This court again in the same volume, page 630, in *Commercial Life Insurance Company* v. *McGinnis* reaffirmed and reiterated the same idea and held that in a policy containing an incontestable clause that the insurer could not, after the expiration of the time, avoid such policy for any cause not included within the exception and said, in effect, that the incontestable clause was a sort of statute of limitations in favor of the insured

within which time the insurer must, if ever, test the validity of the policy.

In 1913 in the first case written by the Supreme Court after the statute in this state went into effect, and with the clause in the policy, the court followed the great weight of authority in the United States and cited some of the Indiana cases herein mentioned and said that at that time they conceived the law to be that an incontestable clause precluded every defense to the policy other than the defenses excepted in the provision itself. *Indiana, etc., Life Ins. Co.* v. *McGinnis* (1913), 180 Ind. 9, 101 N. E. 289.

The next time this court was called upon to pass upon such clause was in *Ebner, Admr.* v. *Ohio, etc., Ins. Co.* (1918), 69 Ind. App. 32, 118 N. E. 829, wherein it again said that the insurer must, if ever, test the validity of the policy within the incontestable period.

This court followed the McGinnis case, *supra,* again in *North American Life Insurance Co. of Chicago* v. *Copeland* (1929), 91 Ind. App. 710, 170 N. E. 927. This court in the last case touching upon this subject quoted from the Ebner and McGinnis cases, *supra,* to the effect that affirmative action should be taken within the period named in the incontestable clause and held that the affirmative action must be taken within the time limit or not at all. *Federal Life Insurance Co.* v. *Relias* (1934), 99 Ind. App. 115, 185 N. E. 319.

The policy here provides that double indemnity shall be paid if all premiums have been paid ". . . in the event of the death of the insured, resulting from bodily injury, sustained and effected directly through external, violent and accidental means (murder . . . not included) exclusively and independently of all other causes, provided such death shall occur within ninety days from the date of the accident." It is my contention that this is ambiguous in that under the decisions in this state

one who meets his death through "external, violent and accidental means" even though such means be received by the insured while someone else was perpetrating the felony of robbery, it was accidental.

The earliest Indiana case on the question of ambiguous insurance contracts is *Grant et al.* v. *The Lexington Fire, Life and Marine Insurance Company* (1854), 5 Ind. 23, wherein the court said (p. 27) : "Insurance policies are to be liberally construed in favor of the assured; *and an exception is to be* STRICTLY *construed against the underwriters.*" (Our italics.) In the same volume in the case of *The Kentucky Mutual Insurance Company* v. *Jenks* (1854), page 96, the court said (p. 103) : *"It is not good policy in the Courts to favor such cunningly devised insurance policies,* as that whatever event happens, the underwriters may reap the premium and escape the risk. On the contrary, some degree of acuteness should be called in to uphold and enforce such agreements, whenever there has been a fair contract and a substantial compliance." (Our italics.) ·

In the case of *Pacific, etc., Ins. Co.* v. *Alsop, Exr.* (1922), 191 Ind. 638, 640, 134 N. E. 290, the court said: "The established rule is that an insurance policy prepared by the insurer, the form of which the insured can not control nor alter, which may not even be seen by the insured until it is delivered to him in final consummation of the contract of insurance, shall not receive a strained construction as against the insured, but that doubts as to its construction arising from *contradictory provisions or ambiguous expressions* which it may contain are to be resolved against the company that issued it." (Our italics.)

In the more recent case, if not the last expression of opinion by the Supreme Court, the court said the following with citation of authority for each statement: "Since the policy in the instant case insures generally

by clear and comprehensive language against death from bodily injuries by accidental means, of which there are visible marks or wounds on the body, liability for such a death *will not be destroyed by language of exception, unless such exception shall be clear,* AND FREE FROM REASONABLE DOUBT. If a policy be ambiguous, the doubt will be resolved against the insurer. . . .

"An insurance policy should be so construed as to effectuate indemnification to the insured or his dependent beneficiary against loss, rather than to defeat it. . . . Where any reasonable construction can be placed on a policy that will prevent the defeat of the insured's indemnification for a loss covered by general language, that construction will be given . . .

"It is the duty of the court to give such construction to the policy, if the language fairly admits, as will make it of some substantial value and carry out the intention expressed therein that liability is incurred where death occurs from accidental injury." *Masonic Acc. Ins. Co.* v. *Jackson* (1929), 200 Ind. 472, 481, 482, 164 N. E. 628.

If these rules of construction mean anything I believe that we should follow them. *The appellee here in its brief and in oral argument admits that as to the deceased policy holder this was death through injuries sustained and due to external, violent and accidental means, exclusively and independently of all other causes.* If this was such to him, and it seems to be without dispute, then there is ambiguity in the policy. If the policy is capable of more than one construction and if one contracting party believes that the policy means one thing while the other contends that it means something else I can not understand why it can be anything else but ambiguous.

In the case of *Atkinson, Admr.* v. *Indiana, etc., Ins. Co.* (1923), 194 Ind. 563, 143 N. E. 629, the Supreme

Court had before it a case where the insurance company contended that an exception stated in language no clearer than the present case was not ambiguous but it was held that such an exception should not control. In that case the policy provided that "after one year from the date of issue this policy shall become incontestable if the premiums have been duly paid, except in case of self-destruction within two years, whether sane or insane, and except that military or naval service in time of war without a permit from the company, is a risk not assumed under this policy at any time." The insurance company contended that since the exception provided that one in military service in time of war without a permit from the company was a risk not assumed while the appellant contended that at the time the insured met his death he was not in military service in that he had been given a pass to absent himself from camp for a few hours, although he, during that time, was subject to call by the military authorities. The court there said that the possibility of such a construction by the insurance company in the face of the construction contended for by the insured discloses an ambiguity. If that policy was ambiguous the one in the case at bar is more so and we are bound by the prior decisions of the Supreme Court. The court there said (p. 568) : "This very state of conjecture suggests the rule of law, long adhered to, that, in construing an insurance contract, which, by ambiguities, is capable of two reasonable interpretations, that interpretation will be adopted which is most favorable to the insured, and against the insurer," and cited a long list of authorities to sustain its view.

In the case of *Travelers' Protective Association* v. *Fawcett* (1914), 56 Ind. App. 111, 104 N. E. 991, the identical question as presented in the instant case was before this court. The insurance company there con-

tended that the condition relied upon exempted it from liability for injury or death resulting from intentional injury inflicted by another person on the insured and for the purpose of that case the court adopted that construction. The insurance company contended that a complaint that showed upon its face that the insured met his death from intentional injury inflicted by another when the policy specifically excepted it, was bad on demurrer. The court there said (p. 116) : "It is true that this paragraph shows that the assured was assassinated by a person who was attempting to rob the bank, but this does not amount to a showing that his death did not result from accidental means within the terms of the certificate and by-laws" and that since the complaint alleged that Fawcett was shot through the body by a ball from a pistol and thereby instantly and accidentally killed by Thomas Hoal the other allegations are not sufficient to overcome this general allegation that the insured was accidentally shot and injured and that therefore the complaint is clearly sufficient. The majority opinion says that they agree with this proposition and then proceed to arrive at the opposite conclusion. Of course I will agree that this court can overrule any of its former opinions but certainly it can not do this by saying that it agrees with the result reached in the opinion attempted to be overruled as to the only question presented in that case, which question is identical to the one presented here, that is, whether or not the demurrer to the complaint here was properly sustained. I believe that, for one of many reasons, we are bound by the Fawcett case.

The majority opinion quotes from a Louisiana case using dicta of that court which is clearly outside the matter decided. The only question in the Louisiana case was whether or not the insured met his death by accidental means, and the court held that he did not be-

cause he had been the aggressor in the fight which caused his death. The citation of this case along with the case of *State Life Insurance Company* v. *Allison* (1920), (C. C. A.), 269 Fed. 93, 14 A. L. R. 412 (cases which the insured cites) and also the cases of *State Life Insurance Company* v. *Little* (1924), (Tex. Civ. App.), 264 S. W. 319; *State Life Insurance Company* v. *Allen* (1936), (C. C. A. Tex.), 81 Fed. (2d) 618; *State Life Insurance Company* v. *Parry* (1935), (Tex. Civ. App.), 88 S. W. (2d) 763; *State Life Insurance Company* v. *Barnes* (1933), (Tex. Civ. App.), 58 S. W. (2d) 189; *State Life Insurance Company* v. *Cumpton* (1932), 144 So. 769 (La. App.) ; *State Life Insurance Company* v. *Spencer* (1933), (C. C. A. Tex.), 62 Fed. (2d) 640·; *State Life Insurance Company* v. *Wilson* (1933), (Tex. Civ. App.), 57 S. W. (2d) 355; *State Life Insurance Company* v. *Sullivan* (1932), (C. C. A. Cal.), 58 Fed. (2d) 741; *State Life Insurance Company* v. *Nolen* (1930), (Tex. Com. App.), 24 S. W. (2d) 22; *State Life Insurance Company* v. *Coffrini* (1922), (C. C. A. Pa.), 285 Fed. 560, which I found while investigating this matter show clearly that the *insurer* could not have meant the same thing in any one of these cases as to the attempt to exempt murder. These policies were issued in Texas, Louisiana, Alabama, California and Pennsylvania as well as the instant case in Indiana.

Murder as defined by their respective criminal codes is not the same in any of these states and this brings us to a discussion of what the average man, in common parlance, conceives murder to be. If the average man believes murder to be the statutory definition in Indiana as interpreted by the majority opinion it means that "whoever, in the perpetration of or attempt to perpetrate a rape, arson, robbery or burglary, kills any human being, is guilty of murder in the first degree. . . ." If it could be said that this was the average man's idea

of "murder" it might be that there was no ambiguity in the use of this word and that a person meeting his death by violent, external and accidental means when there had been an attempt on the part of one unknown to the insured to perpetrate a rape, arson, robbery or burglary he was not covered by such a policy. But this is not all that the statute of Indiana regards as murder. If a railroad, interurban or street-car track is obstructed willfully and maliciously and as a result a person is killed in the crash it follows that if murder is to be interpreted as the majority opinion herein interprets it, anyone with a policy that provided that if he meet his death by violent, external and accidental means could not recover under such policy because that by statute is held to be murder in Indiana. Acts 1905, ch. 169, §413, p. 584, §10-3902 Burns 1933, §2496 Baldwin's 1934. Or if anyone maliciously or even mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car or train of cars, street car, or interurban car on any railroad or against any water craft and anyone is injured or wounded by such act from which death ensues, recovery could not be had under the majority opinion herein, because this would also be murder. Acts 1905, ch. 169, §410, p. 584, §10-4520 Burns 1933, §2493 Baldwin's 1934. Or if there should be a duel and death resulted therefrom the beneficiaries of the deceased duelist could not collect under a policy under the majority opinion, although clearly he would have met his death by violent, external and accidental means. Acts 1905, ch. 169, §348, p. 584, §10-3402 Burns 1933, §2405 Baldwin's 1934, whether the duel be fought in this state or in some other state where dueling might not be prohibited by law.

One of the strangest anomalies to be found is where

any number of persons assemble for an unlawful purpose and intend to injure any person by violence and as a result thereof do actually injure or assault another person and that person thereby meets his death by violent, external and accidental means, his representatives could recover under this policy as such is deemed to be lynching and not murder within our statute. Acts 1905, ch. 169, §440, p. 584, §10-3306 Burns 1933, §2526 Baldwin's 1934.

Neither the insurance company nor the insured had any idea that murder was as fixed by the majority opinion here. Had the policy-holder, immediately after receiving this policy, some doubt as to whether murder was excepted and he resorted to a dictionary or encyclopedia to set his mind at rest, as to the probable definition of murder, after such search he would, no doubt, have concluded that if he met his death by violent, external and accidental means even at the hand of a third person as in this particular case, the definition that he found there could not have led to any such conclusion. Webster's New International Dictionary, 1931, defines murder as "The offense of unlawfully killing a human being with malice aforethought, express or implied." The foregoing is one of the two most usual definitions of murder occurring in the judicial decisions; the other is essentially that given by Blackstone, quoting Sir Edward Coke. In the United States this is stated as follows: The offense committed "where a person of sound memory and discretion unlawfully kills any reasonable creature in being and in the peace of the commonwealth with malice aforethought expressed or implied." At common law there were no grades or degrees of murder, but by statute in many states of the United States the offense is divided into two degrees; murder in the first degree being the most severely punished and restricted to those cases where the killing was willful,

deliberate, premeditated, or especially cruel, or where it was done in the commission of some heinous felony, as arson, rape, etc. Murder is intentional and unlawful homicide."

"The unlawful killing of a human being with malice aforethought; the unlawful killing of another with malice; the killing of a human being directly or indirectly without excuse or justification and by any other means other than perjured or false evidence before a tribunal of justices." New Standard Dictionary of the English Language, 1932, Funk and Wagnalls.

"Murder, in law, the unlawful killing of a person with malice aforethought." The Ency. Brit. 14th Ed. 1929, Vol. 15.

"Murder is the unlawful and intentional killing of a human being by a human being." Chambers Ency.

"The unlawful killing of a human being with malice aforethought." The New International Ency. 1916.

From these definitions it is clear that the common idea of murder is not that malice is implied by law and in the interpretation of this word this court or any court is bound to interpret it as the man of the common ordinary understanding conceives it to be or as used ordinarily by the common man in everyday usage. As the majority opinion interprets it it is used in a *highly technical* or strictly statutory sense. The cases have held the word "murder" to be a *technical* word and as the Indiana cases have said a "term of art." This court should not so interpret it nor should it be so interpreted at all in a civil case. The parties here did not have the least idea that they were contracting to be bound by a criminal statutory definition.

In the beginning of incontestability clauses it was strenuously contended by the insurers that such a clause did not prevent them from relying on fraud because fraud had always been a defense to almost every con-

ceivable situation, and they could not see how an incontestable clause could bar them from their right to set up fraud as a defense. In the beginning there was probably some doubt on the part of some of the courts as to whether or not fraud was excluded by this clause but today a vast majority of the jurisdictions hold that fraud is barred absolutely by the incontestable clause. Cooley (2) Volume 5, page 4501. "Life insurance companies long ago discovered that resistance to prompt and full payment of death benefit proceeds of policies was prejudicial to increase of business. Particularly was harmful resentment created when premiums had been paid for many years by an insured who confidently expected he would leave his dependents provided for. No matter how fraudulent had been the conduct of the applicant while procuring issuance of his policy, the public noted only the fact of refusal to pay.

"To overcome such fears and uncertainties on the part of persons solicited to invest in life insurance, the companies invented a so-called incontestable clause which was inserted in and made a part of the policy contracts. The insurer thereby covenanted that after a lapse of a specified period of time from date of issuance the validity of the policy never would be questioned by the company. Occasionally the status of incontestability was made to attach at the date of issuance, but usually the insurer reserved one or two years within which it might make an issue of the obligation to pay death benefits.

"Competition forced the old line life insurance companies to adopt the clause in some form two decades ago. The few companies which lingered outside the pale were drawn in by enactment of statutes in nearly all American states. It is well-nigh impossible to find a life insurance policy of recent date issued by any insurance company except some fraternal benefit organiza-

tion, which does not contain an incontestable provision."
19 Ill. Law Review 226.

The same vigorous contention was made in the first
suicide cases but today a majority of all the states follow
the well recognized weight of authority that the incon-
testable clause also bars the defense of suicide. Here the
insurance company is starting the same cycle and even-
tually the same result will be reached, so why should
not the sane and modern viewpoint be adopted and the
rule be declared to be that the incontestable clause cov-
ers murder as well as fraud and suicide.

The majority of the court in their opinion say that
they think that the incontestability clause should not be
applied to murder in Indiana although they concede
that it is applied to suicide, and that the incontestability
clause should not be allowed to be set up against the
defense of murder "because of the differences in the
risks assumed by insurance companies when they insure
against suicide or murder." By this they inferentially
say that there is a greater risk assumed by the insurer
in murder cases than in suicide. This statement was
evidently made without any regard to the facts, as all
the figures available in any compilation of statistics
show conclusively that there are many, many more sui-
cides than murders. In a compilation based on the com-
bined mortality experience of companies having 83.2%
of the number of ordinary policies outstanding on De-
cember 31, 1935 in all U. S. legal reserve life insurance
companies it was found that in the total number of
deaths for ten months in 1935 that suicide was account-
able for 4,084 and that homicides of all grades totaled
only 501; and that there were 25 suicides to each 100,000
deaths and only three homicides of all degrees to each
100,000 deaths and that in 1936 for a period of ten
months there were 3,768 suicides and only 470 in all de-
grees of homicide.

From data based on the combined mortality experience of companies having 86.9% of the number of industrial policies outstanding on December 31, 1935, in all U. S. legal reserve life insurance companies for 10 months of 1935 there were 3,187 deaths all due to suicides and 1,684 due to all degrees of homicide. For 10 months in 1936 suicides accounted for 3,010 while all degrees of homicide totaled 1,483.

The statistical abstract of the United States in 1935, table 78, page 83, shows that out of 1,342,106 deaths in 1933, 19,993 were due to suicide while there were only 12,124 due to all grades of homicide.

These figures disclose that if all these 1,342,106 people had been insurable risks that the probability of an insurance company having to pay for one murdered as to the probability of its having to pay in case of those committing suicide would be about 1 to 25, or, in other words, there are 25 times as many suicides as murders. From these figures it is more than clear that the inference in the majority opinion that the risk is greater in murder than in suicide is absolutely without foundation in fact.

As a further indication that the legislature conceived incontestable clauses to be exactly what the courts had interpreted them to be, namely, that the policy should be incontestable for any purpose except those stated in the Act of 1909, *supra,* the legislature in 1935 (Acts of 1935, ch. 162, §151, at page 683) added to the former act by making it possible for the insurance companies, at their option, to add to the incontestable clause provisions which granted additional insurance specifically against death by accident. If this could have been done under the 1909 act as interpreted by the courts there would have been no reason or necessity for adding this to the law in 1935.

The interpretation placed upon the incontestable clause by the United States District Court for the North-

ern District of Indiana and the Circuit Court of Appeals for this circuit is the same as that placed thereon by the Indiana courts, and this is an additional and further reason why the incontestable clause should govern here. *Columbian Nat. Life Ins. Co.* v. *Wallerstein* (1936), 13 Fed. Supp. 865; *Federal Life Ins. Co.* v. *Zebec* (1936), 82 Fed. (2d) 961.

The appellee contended in oral argument and there was some discussion in this court to the effect that this was the first opportunity that the appellee had had to have this ambiguous language construed. Four years before this policy was issued the legislature made it possible to have such contract construed by the judgment of a competent court under the declaratory judgment act of 1927. The insurance company here could have had, at any time after the policy was issued, these words construed by a court but they preferred rather to let this ambiguous language stand until after the death of the insured and then attempt this contest, which contest the incontestable statute says they should not have.

From all of the above it seems clear to me that the complaint in the instant case states a good cause of action and the demurrer thereto should have been overruled.

See also the following cases: *Travelers Insurance Company of Hartford, Conn.* v. *McConkey* (1888), 127 U. S. 661, 8 S. Ct. 1360; *The Imperial Fire Insurance Company of London, England* v. *The County of Coos* (1894), 151 U. S. 452, 14 S. Ct. 379; *Northwestern Mutual Life Insurance Company* v. *Johnson* (1920), 254 U. S. 96, 41 S. Ct. 47; *Mutual Life Ins. Co.* v. *Hurni Packing Co.* (1923), 263 U. S. 167, 44 S. Ct. 90; *Aschenbrenner* v. *U. S. Fidelity & Guaranty Co.* (1934), 292 U. S. 80, 54 S. Ct. 590, 78 L. Ed. 1138; *Kascoutas et al.* v. *Federal Life Insurance Company* (1922), 193 Iowa 343, 185 N. W. 125, 22 A. L. R. 294; *Myers* v. *Liberty Life*

*Ins. Co.* (1927), 124 Kan. 191, 257 Pac. 933, 55 A. L. R. 542, and annotation following; *Fore* v. *N. Y. Life Ins. Co.* (1929), 180 Ark. 536, 22 S. W. (2d) 401, 67 A. L. R. 1358, and annotation following; *New York Life Ins. Co.* v. *Adams* (1931), 202 Ind. 493, 176 N. E. 146; *Metropolitan Life Ins. Co.* v. *Conway* (1930), 252 N. Y. 449, 169 N. E. 642; Tulane Law Review, Vol. 6, page 634, and Virginia Law Review, Vol. 19, page 744.