PRUDENTIAL INSURANCE COMPANY OF AMERICA *v.* RICE.

[No. 27,938.   Filed January 28, 1944.]

*Hickey, Dewey & Nattkemper,* of Terre Haute, for appellant.

*James F. Harper,* of Terre Haute, for appellee.

SHAKE, J.—In 1936 the appellant issued to the appellee a policy of life insurance, providing, also, for the payment of certain disability benefits to the insured if he should "sustain a physical impairment such as . . . the permanent loss of the sight of both eyes." The appellee sued on the policy, alleging that in 1941 he sustained "the complete and irrecoverable loss of the

sight of both eyes." Appellant answered that appellee's disability was the direct and proximate result of his attempt to commit self-destruction when he was of sound mind. A demurrer to the answer was sustained and the appellant suffered judgment to go against it upon its refusal to plead over. The only question before us is whether the answer sufficiently alleged a defense to the action.

The policy contained a provision to the effect that it should be incontestable after one year from the date of issue, but we do not consider this of importance to the case at bar. The incontestability clause merely limits the time within which matters affecting the validity of the policy may be urged. It has no reference to whether a particular casualty subsequently occurring is covered by the terms of the policy. In *Guardian Life Insurance Co.* v. *Barry* (1937), 213 Ind. 56, 62, 10 N. E. (2d) 614, this court said:

> "There is a recognized distinction between contesting the validity of a contract and defending against an action upon the contract upon the ground that a situation in which the defendant is liable has not arisen."

See, also, *Werner* v. *State Life Ins. Co.* (1937), 104 Ind. App. 27, 6 N. E. (2d) 786,. 7 N. E. (2d) 209. The action before us belongs to the latter class of cases. It does not involve the validity of the policy. While numerous decisions may be found in which the above distinction has not been observed, we think it is, nevertheless, fundamental.

For the purposes of this case it is admitted: (1) That the appellee's disability was the proximate result of wounds which were self-inflicted when he was of

sound mind, in his unsuccessful attempt to commit suicide; (2) that there were no express limitations or restrictions in the policy sued on against recovery of benefits resulting from disabilities so caused; and (3) that there is no statute in this State bearing upon the subject.

The appellant relies, principally, upon three cases in other jurisdictions. In *Fanti* v. *Travelers Insurance Co.* (1942), 264 App. Div. 724, 34 N. Y. S. (2d) 34, the Supreme Court of New York, Appellate Division, said, on similar facts:

> "We are of opinion that it was an implied condition of the policy that the insured when in sound mind purposely would not inflict disabling injuries upon himself, thus creating the liability against which he was insured."

In *Bullas* v. *Empire Life Ins. Co.* (1931), 4 D. L. R. 443, the Supreme Court of Ontario, Canada, held that recovery under such circumstances would be against public policy. And, in *Elwood* v. *New England Mutual Life Insurance Co.* (1931), 305 Pa. 505, 158 A. 257, the court, after observing that a sane attempt at suicide is grossly immoral and was an infamous crime at common law, said that recovery must be forbidden in such a case because the offender may not be permitted to take advantage of his own wrong. We do not find in either of these cases any exhaustive consideration of the subject. There may be other cases to like effect, but the above are sufficient to illustrate the theories upon which the appellant relies for a reversal, namely, broad public policy, implied contract, and the specific rule embraced in the common-law maxims that, "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property

by his own crime." *Box* v. *Lanier* (1903), 112 Tenn. 393, 409, 79 S. W. 1042, 64 L. R. A. 458.

There was a time when life insurance was prohibited by law, upon the theory that it operated as an incentive to those who would benefit by the termination of a life to hasten that end. 37 C. J., Life Insurance, § 3. *State ex rel. Attorney General* v. *Merchants Exchange Mutual Benevolent Society* (1880), 72 Mo. 146. Suicide was once regarded as an infamous crime and, since a penalty could not be inflicted upon the perpetrator, it was decreed that his estate should be forfeited to the crown and his body subjected to the indignity of being buried in the highway without benefit of clergy. 60 C. J., Suicide, § 2. These harsh concepts have long since been softened by force of an enlightened public opinion. It is now universally accepted that life insurance is not necessarily inducive of murder, and we think it may also be said that the more humane view now is that suicide is usually the result of some mental derangement which may or may not amount to actual insanity.

In view of the fact that the question before us is one of first impression in this State, we feel called upon to examine the subject of consummated and attempted self-destruction in its relation to life and disability insurance contracts.

In the leading case of *Ritter* v. *Mutual Life Ins. Co* (1898), 169 U. S. 139, Mr. Justice Harlan declared:

> "When the policy is silent as to suicide, it is to be taken that the subject of the insurance, that is, the life of the assured, shall not be intentionally and directly, with whatever motive, destroyed by him when in sound mind. To hold otherwise is to say that the occurrence of the event upon the happening of which the company undertook to pay,

was intended to be left to his option. That view is against the very essence of the contract.

"There is another consideration supporting the contention that death intentionally caused by the act of the assurance when in sound mind—the policy being silent as to suicide—is not to be deemed to have been within the contemplation of the parties; that is, that a different view would attribute to them a purpose to make a contract that could not be enforced without injury to the public. A contract, the tendency of which is to endanger the public interests or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice or be made the foundation of its judgment. If, therefore, a policy—taken out by the person whose life is insured, and in which the sum named is made payable to himself, his executors, administrators or assigns—expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him, or to whom he was indebted."

In an attempt to ameliorate the harshness of the rule announced in the Ritter case, *supra,* many courts have declared that voluntary self-destruction is a defense to an action on a policy payable to the insured, his assigns, or estate, but not to one brought by any other named beneficiary. See 29 Am. Jur., Insurance, §§ 913 and 914, where the cases supporting this rule are cited. This distinction is predicated upon the presumption that vested interests are involved only when there are such named beneficiaries, but this rule will not bear analysis. See editorial comment in 8 L. R. A. (N. S.) 1124, following the reported case of *Grand Legion of Illinois, Select Knights of America* v. *Beaty* (1906), 224 Ill. 346, 79 N. E. 565. Nor is there any sound

reason for supposing that it is more likely that a sane insured will take his life, or attempt to do so, for his own benefit or for that of his assigns or estate, than for the advantage of his wife and children, who are the natural objects of his affections and who are frequently the named beneficiaries of personal insurance.

The Ritter case was qualified in *Northwestern Life Ins. Co.* v. *Johnson* (1920), 254 U. S. 96, wherein it was held that, unless forbidden by the public policy of the State, an insurance contract silent as to the consequences of death by suicide is enforceable by the widow as the named beneficiary when the insured voluntarily takes his life. It was concluded that the domestic public policy is the controlling factor. This leads us to inquire as to what is the public policy of Indiana, as it relates to this subject, and what effect, if any, such policy has on the contract in suit.

In *Hogston* v. *Bell* (1916), 185 Ind. 536, 544, 112 N. E. 883, it was declared that the public policy of this State must be determined from a consideration of its constitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort. That case quotes with approval from 6 R. C. L. 710, as follows:

"Without minimizing the importance of the doctrine that contracts should not be enforced if they contravene public policy, many courts have cautioned against recklessness in condemning contracts as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well established rule of law. Other

courts have approved the remark of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

Deodands are repugnant to American ideas of justice and have never been recognized by the common law of this country. 23 Am. Jur., Forfeitures and Penalties, § 4. We have no common law crimes in this State and there is no statute declaring an attempt to commit suicide a public offense. The appellant has not called our attention to any administrative practice or court decision of this State that throws light upon the subject.

The precise issue here is not whether suicide merits public condemnation, but whether a contract of insurance which is silent on the subject of suicide is enforceable if the insured, while sane, takes his life. That self-destruction ought never to be encouraged may be conceded. The same may be said as to reckless disregard of one's own safety and failure to exercise ordinary care. The contract here under consideration is silent with respect to a subject concerning which the appellant had the undoubted right to make it positive and clear. The policy might have specified that the company would not be liable for suicide, or attempted suicide, whether the insured was sane or insane. *North American Union* v. *Oleske* (1917), 64 Ind. App. 435, 116 N. E. 68. Indeed, it was declared therein that there should be no liability for benefits resulting from death by accident, "if the

death of the insured resulted from suicide." From this circumstance it is reasonable to conclude that the company did not intend to place any limitation or restriction upon its specifically described and unconditional liability to pay disability benefits for "the permanent loss of the sight of both eyes."

Aside from the purely moral aspects of self-destruction, the most plausible argument in favor of the view that public policy forbids recovery in a case like the one at bar is that suicide places an undue burden upon the government to care for the perpetrator's dependents. This contention is answered to our satisfaction in the case of *Weeks* v. *New York Life Ins. Co.* (1924), 128 S. C. 223, 122 S. E. 586, which involved the rights of the assignee of a policy to recover where the insured was executed for the crime of murder. The court said:

> "Over against the public good to be subserved by avoiding the policy contract, upon the samewhat tenuous theory that such forfeiture would tend to discourage the commission of capital crimes, is to be set the public good to be promoted by requiring payment of the insurance to the end that creditors be protected, commercial transactions safeguarded, and dependent women and children provided with the material necessities of life. Certainly, the interest of the State in saving the dependents of an executed criminal from becoming a charge upon public charity or from having to seek a livelihood under conditions of poverty and degradation, calculated to make them an economic liability or a social and civil menace, is sufficiently obvious. It would seem equally obvious that the task of balancing considerations of that character is peculiarly within the province of the makers of the organic and statute law of the State, and that, in the absence of a definite expression from the lawmaking power the subject is one in regard to which no clear reason or pressing necessity exists for the Courts to make the law by declaring a rule of public policy."

We have already alluded to the more charitable attitude now generally indulged on behalf of those who take their own lives or attempt to do so. The modern view is that one who does such a rash thing is usually the unfortunate victim of some mental or physical disturbance, burden or pressure which is sufficient to warp the natural human impulse to survive, though it may not amount to actual unsoundness of mind. The law recognizes that many situations, short of insanity, may justify relieving one from the legal consequences of his acts. Thus wills are set aside on account of undue influence, and contracts are voided because the parties, though not of unsound mind, were induced to enter into them through ignorance, fear, fraud, or deceit. The line of demarcation between what amounts to responsibility and irresponsibility is an extremely narrow and elusive one, and situations involving such controversies are a fertile field of litigation. It is of the highest importance that insurance contracts should be removed as far as practicable from such vicissitudes. This is as much to the advantage of insurance companies, which are dependent upon public confidence for their business, as it is to policyholders who are concerned, above all else, that the protection which they purchase shall be certain.

We think it may be taken for granted that the rates established by insurance companies are based upon data that reflects the nature as well as the extent of the risks assumed as revealed by the plain import of the terms of their policy contracts. If this is true, a policyholder would find himself in the position of paying for protection which would never be available if we should, by judicial construction, interpret the contract terms according to any other standard.

We conclude that the appellant bound itself unconditionally to pay the appellee certain benefits if he should sustain the permanent loss of the sight of both eyes. The defense that the appellee's disability resulted from his rational attempt at self-destruction is, therefore, unavailable. The demurrer to the appellant's answer was properly sustained.

Judgment affirmed.

NOTE.—Reported in 52 N. E. (2d) 624.