The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff,

v.

The GRAY MANUFACTURING COMPANY, Defendant-Appellant,

and

Jennie Johnson Ditmars, Defendant-Appellee.

No. 188, Docket 28448.

United States Court of Appeals Second Circuit.

Argued Dec. 3, 1963.

Decided Jan. 29, 1964.

Maxwell M. Merritt and John J. Mc-Grath, Hartford, Conn., for defendant-appellant.

Robert Y. Pelgrift, Hartford, Conn. (Pelgrift, Dodd & Stoughton, Hartford, Conn., Hubbell & Van de Walle, New York City, on the brief), for defendant-appellee.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

By the terms of an employment contract concluded in 1957, appellant Gray Manufacturing Company agreed to maintain certain insurance policies previously secured on the life of Walter Ditmars, an executive of the Company. Stated briefly, the agreement provided that Ditmars' wife, the present appellee, was to become the beneficiary of these policies for a period extending through December 31, 1962, the date on which Ditmars' employment was to terminate; as of January 1, 1963, Gray was to have exclusive rights to the proceeds. Late in the afternoon of December 31, 1962, Ditmars walked into the Putnam Memorial Hospital in Bennington, Vermont, located an empty room, and intentionally took his own life with a bullet. Death was virtually instantaneous. Admitting liability, the insurer brought this action in inter-

pleader, 28 U.S.C. § 1335, to determine the conflicting rights of Gray and Ditmars' widow to the proceeds, totalling some $104,036.29. On cross-motions for summary judgment, the District Court ruled in the widow's favor, and the Company appeals.

Since the appeal is from the award of summary judgment, the material facts are not in dispute. As revealed by the pleadings, affidavits, and stipulations of the parties, the insurance policy in question was originally obtained in 1944. At the time, Ditmars was Gray's president, and the policy was intended to provide what is commonly considered "key-man" insurance; as is customary in such arrangements, the Company was to pay all premiums and to receive all benefits. In February of 1957, as Ditmars approached his sixty-second birthday, the parties decided to renegotiate their relationship. The new agreement, to extend through December 31, 1962, called for Ditmars to serve "as a consultant and in an advisory capacity" to Gray and its Board of Directors; Ditmars also warranted that he would not engage in any enterprise competitive with that of the Company. In return, Gray contracted to pay Ditmars an annual salary of $25,000, and to extend to him purchase options on a substantial block of Gray's capital stock. And, most relevant for present purposes, the Company further agreed that "as additional compensation to Ditmars," it would continue for the term of the contract the existing insurance policies on Ditmars' life, then totalling $200,000 in face amount. To enhance the attractiveness of this concession, the agreement provided for a change in beneficiary. Thus, Jennie Johnson Ditmars, the decedent's wife, was to become the beneficiary of the entire $200,000 for the years 1957 and 1958; of $150,000 for 1959; and of $100,000 for 1960, 1961 and 1962. Concurrently with the employment agreement, the insurance policies were amended so as to reflect this new understanding.

Gray did, in fact, pay the premiums for the years 1957 through 1962, and

Ditmars reported these payments in his income tax returns as additional compensation for the years in question. There is nothing before us to indicate, moreover, that Ditmars did not satisfactorily perform the consulting services required of him during the life of the agreement. For our purposes, therefore, it appears that when Ditmars entered the hospital in Bennington, Vermont, the contract had been complied with in all material respects, and only eight hours remained before it was to expire.

The stipulation of the parties containing the only significant reference to the question of Ditmars' suicide is a model of unenlightening brevity. In its entirety, the stipulation recites that "Said Walter E. Ditmars entered Putnam Memorial Hospital on the day in question as a visitor shortly before inflicting said bullet wound on himself and for this purpose he sought and utilized an unoccupied room at said hospital." Neither party offered a scintilla of evidence which might illuminate Ditmars' purpose or his motivation; his physical and mental condition, his emotional and economic status, were all unrevealed.

In his opinion below, Judge Clarie found no reason to depart from the clear wording of the employment agreement and the insurance policy. Rejecting arguments of public policy and actual fraud, he concluded that the contracts required the proceeds to be paid to Jennie Ditmars if her husband died before midnight on December 31, 1962; he found no restrictions imposed upon payment which related to cause of death. He noted, moreover, that the failure of the parties to indicate that suicide might be subject to different treatment was especially significant since the policy itself contained a clause providing that no benefits were to be paid in cases of suicide occurring within two years of the date of issuance of the policy. Since this period had long since elapsed, and since he found that Mrs. Ditmars' rights as a beneficiary had vested, cf. Farmer's Loan & Trust Co. v. McCarty, 100 Conn. 367, 124 A. 40 (1924), he concluded that she was entitled to the proceeds, regardless of Ditmars' mental state or motivation at the time of his act.

On appeal, Gray concedes that the literal wording of the employment agreement required that the proceeds be paid to the appellee. The Company argues, however, that Ditmars' intentional act of self-destruction, occurring but a few hours before the agreement was to expire, created equitable rights in Gray superior to the legal claims of Ditmars' widow. Under the circumstances, Gray contends, recovery for Jennie Ditmars would condone an immoral act; we are compelled, it argues, to avoid such a result as a matter of "public policy." Even more strenuously, Gray maintains that Ditmars' suicide violated a duty of fair dealing to the Company, and that recovery for his widow would, therefore, permit Ditmars to profit by his own wrong. At the very least, Gray insists, an inquiry should be held into Ditmars' sanity at the time of his death.[1] If he were sane, or so the argument goes, his intentional suicide should not be permitted to frustrate the Company's rights to the proceeds of the policy for, in such a case, it urges, the sole motivation for Ditmars' suicide must have been to enrich his widow.

It is not difficult to dispose of the Company's "public policy" argument. In Northwestern Mut. Life Ins. Co. v. Johnson, 254 U.S. 96, 41 S.Ct. 47, 65 L.Ed. 155 (1920), Mr. Justice Holmes clearly expressed the conviction of a unanimous Supreme Court that recovery by a beneficiary whose insured had committed suicide could not be *presumed* to violate public policy. In the absence of a clause

1. In the lower court Gray asked for judgment on the papers submitted to Judge Clarie; no request was made for a trial on the issue of sanity by either party. It thus would seem that both parties believed the sanity of Ditmars unimportant to the resolution of the case. Gray's request for a trial on this issue seems to be an afterthought.

in the insurance contract expressly excluding suicide from the risks generally covered, the Court held, recovery was to be denied only if the public policy of the state involved clearly so required. In the instant case, the parties have been unable to discover any such "public policy" in the statutory or decisional law of Connecticut, the state with the most significant contacts to the contract of insurance. While the Connecticut courts have not been confronted with a situation similar to that before us, it seems significant that attempted suicide does not constitute a crime under Connecticut law. It seems relevant to note, moreover, that the vast majority of those jurisdictions which have passed on the question have permitted a beneficiary to recover upon an insurance policy in cases in which the insured has taken his own life. See, e. g., 6 Couch, Cyclopedia of Insurance Law § 1262; 1 Appleman, Insurance Law & Practice § 367; Prudential Ins. Co. v. Rice, 222 Ind. 231, 52 N.E.2d 624 (1944); Leogrande v. Societa M. S. Fratelanza Italiana, 133 N.J.L. 51, 42 A.2d 570 (1945), aff'd, 133 N.J.L. 558, 45 A.2d 323 (1946); Steel v. Driver Salesmen's Union, 147 Pa.Super. 172, 24 A.2d 20 (1942); Patterson v. Natural Premium Mut. Life Ins. Co., 100 Wis. 118, 75 N.W. 980, 42 L.R.A. 253 (1898). See also Northwestern Mut. Life Ins. Co. v. Johnson, supra.

If this were simply a case in which an insurance company sought to avoid payment to a beneficiary, it thus is settled that the widow's recovery would clearly be warranted; for, by its express terms, the policy in question ruled out recovery only for those acts of suicide occurring within two years of the date of issuance. In the words of Justice Holmes, "[w]hen a clause makes a policy indisputable after one or two years, the mere evocation of a possible motive for self-slaughter is at least not more objectionable than the creation of a possible motive for murder. The object of the clause is plain and laudable—to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done." Northwestern Mut. Life Ins. Co. v. Johnson, supra, 254 U.S. at 101–102, 41 S.Ct. at 48–49, 65 L.Ed. 155.

Gray's principal contention on appeal invokes the duty of fair-dealing traditionally owed an employer by his employees. Thus, the Company argues that "Ditmars' conduct in wrongfully destroying himself in order to bestow a windfall benefit upon the appellee, the natural object of his bounty, certainly fails to measure up to the standard of fidelity and loyalty required of even the run-of-the-mill employee and was certainly inappropriate for a former officer and director who at the time of his death was a highly compensated consultant."

Yet, even if this familiar duty of loyalty is recognized, the Company's reliance upon the obligation in this context seems misplaced. For the essential premise of Gray's argument—that Ditmars coolly decided to take his life in order that his wife might benefit at the Company's expense—seems a matter which is not only unproved but truly unprovable here. Indeed, even if a sanity hearing were to be held, and a postmortem battle of experts resulted in the finding that Ditmars had been sane, it would appear virtually impossible to establish from the available evidence that Ditmars' sole motive was to benefit his wife.

The obscure impulses and intense subconscious pressures which can drive a man to self-destruction have long fascinated and perplexed experts and laymen alike. And as the surface superficialities have been discarded and the problem examined with the insights that psychology and psychiatry can bring to bear, scholars have learned to distrust any one simple or "obvious" explanation for a given act of suicide.[2] Thus, while failure

2. It is not inconceivable that there may be rare cases in which a particular act of suicide may be explicable in terms of what may appear the one "simple" motive. Such an analysis may seem on the surface to be valid, for example, in the

or melancholy depression might "automatically" seem the "natural" or "obvious" harbingers of potential suicide, observers have noted that the suicidal drive is, ironically, often at its strongest in individuals at precisely the moment of their greatest triumph or most intense period of exhilaration. Ellis & Allen, Traitor Within: Our Suicide Problem 153–154 (1961); K. Menninger, Man Against Himself 45 (1938). In a classic study, Emile Durkheim painstakingly explored the sociological influences in a vast number of cases, and traced the roles played by such varied and complex factors as religion, family background, education, economic status, climate, ethnic origin and marital status. See Durkheim, Suicide (1960). Durkheim pointedly noted, however, that he was compelled to speak in generalities, and that it was virtually impossible to pinpoint *the* cause of any particular suicide. "Human volition," he explained, "is the most complex of all phenomena. The value of improvised judgments, attempting to assign a definite origin for each special case [of suicide] from a few hastily collected bits of information is, therefore, obviously slight." Id. at 148–49. While general sociological patterns undoubtedly play their part, Durkheim continued, "each victim of suicide gives his act a personal stamp which expresses his temperament, the special conditions in which he is involved, and which, consequently, cannot be explained by the social and general causes of the phenomenon." Id. at 277–78.

The one man who might have been able to explain an otherwise inexplicable act was Walter Ditmars himself, and this he has failed to do. In his absence, it seems impossible in this case to determine with any degree of certainty precisely *why* he decided to commit this act of desperation. Indeed, if Ditmars' attempt had been unsuccessful and he had survived the wound which proved to be fatal, it is probable that psychiatrists would spend years in probing his conscious and subconscious thoughts, searching for the forces which compelled him to the abortive attempt. With Ditmars unavailable for questioning and with nothing in the record to indicate the availability of *any* evidence concerning his state of mind, any determination would strongly savor of guess-work. Judgments should not be permitted to rest upon so ephemeral a foundation.

And if surface "explanations" are sought, it would seem equally reasonable to conclude that Ditmars was driven by personal considerations, wholly unrelated to any benefits which might inure to his widow. Thus, it could be noted that Ditmars was sixty-eight years of age at the time of his death, and that statistics indicate that the tendency towards suicide increases with advancing years. When he entered the hospital, New Year's Eve was approaching, traditionally a time of nostalgic remembering, reflection, and even depression. In eight hours, Ditmars' association with the company which for so long a period had been the center of his working life (even if on occasions subject to contention) was about to come to an end. Even those without psychiatric training can imagine the traumatic effect upon a man of sixty-eight, who knows that within a few hours all ties to his occupation will be severed.

But these factors, just as those external considerations which would be

case of an individual in the painful, terminal stages of a fatal disease. But even here, what at first blush would "clearly" seem the suicide's motivation really falls short of a conclusive explanation. Thus, psychiatrists would search for reasons why· the individual in the case posed behaved differently from the far greater number of people afflicted with the same disease, who fight on until the end. And while a particular act of suicide may lend itself to the sort of "explanation" commonly provided by the daily newspapers, this type of glib analysis can hardly be accepted as definitive. "What amazes one most, is not that these simple explanations are continually offered but that they are so readily and unquestioningly accepted in a world where science and everyday experience alike confirm the untrustworthiness of the obvious." Menninger, infra, at 17.

cited to establish that *the motive* was to enrich his widow, are but superficial "explanations," taking no account of the far more vital role of the subconscious in an act of self-destruction. As Karl Menninger has persuasively noted, "the unconscious purposes are of more significance in understanding the suicide than the apparently simple, inevitable, external circumstances." Menninger, supra, at 19. Truly to understand Ditmars and his act, "we must first of all dispose of the naive notion that suicide is a simple act and recognize that from the psychological standpoint it is very complex, no matter how it may appear. Indeed, a considerable obstacle in the study of suicide is the popular assumption of its simple causal connections." Id. at 20. Under these circumstances, and with the psychological knowledge concerning suicidal drives so inconclusive in this case, it seems impossible to conclude that a court or jury is possessed of the psychic powers required to determine *the* precise motive for Ditmars' suicide, any more than the townspeople of Robinson's poem could divine the hidden anguish of a Richard Cory.[3]

Indeed, it is likely that a responsible body of psychiatric opinion might argue that Ditmars did not even wish his attempt to be successful—that, even at that moment, he did not want to die. They would find it highly significant, in this regard, that Ditmars chose a hospital in which to take his life—the one setting in which a bullet wound was least likely to be fatal, the one site in which life-*saving* facilities were most likely to be present. Under these circumstances, some psychiatrists would suggest that

Ditmars in his then state of mind misjudged the lethal nature of the bullet and might have been prompted by a desire to draw attention or sympathy to himself after he survived. See Menninger, supra. When this approach is taken into account, any attempt to discover the *sole motivation* behind Ditmars' suicide truly does become a voyage of uncertainty.

While Gray pictures Ditmars as an unprincipled schemer, it is at least equally permissible to consider him as a deeply disturbed man, driven by a combination of obscure and complex forces to his own destruction. When viewed in this light, there seems no reason to distinguish the death of Walter Ditmars from that of any other individual who has succumbed for causes beyond his control. And it is, finally, this recognition that Ditmars should not be "held responsible" for the deeply rooted impulses and obsessive compulsions which were the true "causes" of his death which sharply differentiates the present case from those in which courts or juries *are* able to determine "intention" or "state of mind." For here, even if it could be found that Ditmars "intended" to benefit his wife at the company's expense—in the same, overly simplified sense that it may be found that a prisoner "intended" to make a confession or a defendant "intended" to commit murder—this would not and should not end the inquiry. In the interests of an ordered society, it is reasonable to argue that a man who "intentionally" commits a crime will be held responsible for his act, and accept the consequences which society has imposed —whatever may have been the forces

---

3. Whenever Richard Cory went down town,
We people on the pavement looked at him;
He was a gentleman from sole to crown,
Clean favored, and imperially slim.

And he was always quietly arrayed,
And he was always human when he talked;
But still he fluttered pulses when he said,
'Good-morning,' and he glittered when he walked.

And he was rich—yes, richer than a king—
And admirably schooled in every grace;

In fine, we thought that he was everything
To make us wish that we were in his place.

So on we worked, and waited for the light,
And went without the meat, and cursed the bread;
And Richard Cory, one calm summer night,
Went home and put a bullet through his head.

lurking in his background or subconscious which impelled him so to act. But there seems no similar social interest in disregarding the severe psychological dislocations and emotional maladjustments which can drive a man to suicide. In short, there is no rational reason in this case why a jury should be restricted to the sort of limited inquiry long familiar to our law—an inquiry which would end with the simple finding that Ditmars was conscious of the financial benefits which his death would bring to his wife, and as a result to graft on to his employment contract, which was silent on the subject, the suicide exclusion contended for by Gray.

Under the circumstances present here, Judge Clarie followed the only feasible course in relying upon the clear wording of the agreement between the parties. At this stage, any ex post facto psychological examination would merely introduce uncertainty where the contract provides clarity, without any substantial promise of shedding much light upon the true causes of Ditmars' suicide. In cases such as this one, it is best to be guided by the clear wording of the contract, rather than insisting that in each instance the parties must undergo the time and expense of protracted litigation, in a futile effort to comprehend an act which does not lend itself to easy explanation.

In light of the complexities unique to cases of suicide, it need hardly be added that the language and reasoning of this opinion are not intended to furnish a guide to any other situations in which a determination of "intention," "motivation," or "state of mind" is required.

Judgment affirmed.

LEONARD P. MOORE, Circuit Judge (concurring in the result).

I concur in the result. As Judge Clarie found, the employment agreement and the insurance policy required that the insurance proceeds be paid to Jennie Ditmars in the event that Ditmars died before midnight on December 31, 1962. He did. Since many more than the two years of the incontestable clause had elapsed, the cause of his death was immaterial. Gray and Ditmars could have agreed that suicide might void the policy or at least bring about a division of the proceeds such as cash surrender value to the company. They did not. I find no reason to speculate as to the reasons which prompted Ditmars to take his life. The condition of the policy was death. He met that condition. The named beneficiary was entitled to the proceeds.

FRIENDLY, Circuit Judge (concurring).

It is plain that the undenied allegations in the pleadings and the meager stipulation of facts did not entitle Gray to summary judgment. But the grant of summary judgment to Mrs. Ditmars is a different and more perplexing matter. The issue is whether, if Gray could prove at a trial that Ditmars had taken his life for the sole or even for the primary purpose of diverting a large sum of money to his wife from the company of which he had been president and director from 1938 to 1956, and thereafter a well-paid "consultant" for another six years, equity ought not impress a trust in the company's favor—not, indeed, for the entire face amount of the policy, but for the substantial cash surrender value which Gray would have been entitled to collect only a few hours later. Compare the division of proceeds directed in Manufacturers Life Ins. Co. v. Moore, 116 F. Supp. 171 (S.D.Calif.1953).

I cannot agree that Gray's position must be rejected because of a supposed inherent impossibility of its establishing Ditmars' motivation with the degree of assurance usually regarded as acceptable in a court of justice. The age has long since passed when it was "common knowledge that the thoughts of man shall not be tried, for the Devil himself knoweth not the thought of man," Brian, J., in Y. B. 17 Edw. 4 Pasch. f. 2 (1477). Now it is daily business for judges and juries to plumb "the mainsprings of human conduct," C. I. R. v. Duberstein, 363

U.S. 278, 289, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), as, indeed, at Ditmars' instance we directed not long ago with respect to himself, Ditmars v. C. I. R., 302 F.2d 481, 488 (2 Cir. 1962). Life itself may depend on a jury's determination whether a defendant perpetrated a killing with or without "a deliberate and premeditated design to effect the death of the person killed," N.Y.Penal Law, McKinney's Consol.Laws, c. 40, § 1044, a task that often involves a far more subtle evaluation of motives than the problem here presented. E. g., People v. Caruso, 246 N.Y. 437, 159 N.E. 390 (1927); see Cardozo, What Medicine Can Do for Law, in Law and Literature and Other Essays 96–101 (1931). True, in such a case the subject of the inquiry is alive, but he often stands mute and, for obvious reasons, his own testimony as to motivation is rarely given weight. As compared to such a determination, one can have far greater assurance in the "simple" explanation of the motive for tragic suicides of the great depression, when men in excellent physical but poor financial health took their lives rather than suffer the lapse of large insurance policies that afforded the only hope of financial security for their loved ones. This is none the less so because of psychoanalytic efforts to ferret out what caused some to do this when others with a similar problem did not—an inquiry which does not deny the obvious motivation but rather questions why it led to action in some cases but not in others. If the facts we now have with respect to Ditmars were all we could ever get, the inference as to his motive would seem not merely possible but almost irresistible; his attaining what many of us deem the not so advanced age of 68, the memories of the New Year's eves of yesteryear, and the prospective severance of association with a company from which he had been retired on the threat of a proxy fight six years before, see Ditmars v. C. I. R., supra, 302 F.2d at 487, are not nearly so significant as the timing of his suicide on the very day that yielded the optimum combination of financial benefits and life span. One can readily think of facts that might strengthen the inference, and of others that would weaken or even destroy it. But the task is of the sort that courts, regulating the relations of man and man, or of man and society, are frequently obliged to perform; to yield to a belief in "the untrustworthiness of the obvious" without a better substitute is a luxury that is not for them—as we would surely have to recognize if the contract had contained an express condition excluding a suicide for the purpose of maturing the policy.

Neither can I agree that the silence of the contract ends the matter; it would still be possible to impose on it what Corbin calls a "constructive condition" that Ditmars would not mature the policy by taking his life solely or primarily for his wife's financial benefit. 3A Contracts, §§ 653–54 (1960 ed.). The crucial issue is whether we should. Bentham spoke of this process as one wherein the courts have "supplied the shortsightedness of individuals, by doing for them what they would have done for themselves if their imagination had anticipated the march of nature." 3 Works, 190, quoted in Corbin, supra, at p. 140, fn. 9. It is clear enough that if Gray had asked for such a condition, either Ditmars would have agreed to it or there would have been no contract. But what is not so clear is that Gray would have sought a condition of this sort if the possibility of such action by Ditmars had occurred to it. Gray might well have considered that the risk was too small to warrant discussion and resentment, or even that, in the remote event that Ditmars should be willing to go to such lengths, his widow ought be allowed to retain what he so much wanted her to have. Hence I am not convinced either that such a condition would be "in harmony with what they [the parties] would have thought and said if they had foreseen the future," Corbin, supra, p. 140, or that it would accord with "the inherent justice of the situation," Giumarra v. Harrington Heights, Inc., 33 N.J. Super. 178, 109 A.2d 695, 701 (1954),

aff'd 18 N.J. 548, 114 A.2d 720 (1955), which Corbin regards as a more useful formulation, pp. 140–41. Compare 6 Williston, Contracts §§ 668, 669, 825 (1962 ed.). On this basis I join in the judgment of the court.