COMMONWEALTH LIFE INSURANCE COMPANY, Defendant-Appellant,

v.

Roy JACKSON, Plaintiff-Appellee.

No. 1–781 A 220.

Court of Appeals of Indiana, First District.

March 31, 1982.

John H. Douglas, Smith, Maley & Douglas, Indianapolis, for defendant-appellant.

Joseph B. Barker, Susan Geyer Malloy, Martinsville, for plaintiff-appellee.

RATLIFF, Presiding Judge.

## STATEMENT OF CASE

Commonwealth Life Insurance Company (Commonwealth) appeals from summary judgment in the amount of $5,000 policy benefits granted in favor of Roy Jackson, beneficiary of a life insurance policy issued to his son, Gary Jackson. We affirm.

## FACTS

Roy had been insured under a family policy with Commonwealth since 1966. In 1970 a Family Protection Rider was added to the policy providing that Roy's wife and children were insured in the amount of $1,000 each. The children's coverage was to continue until age twenty-five at which time the children's coverage would terminate, but the children could convert to individual policies without evidence of insurability. The conversion provision of the policy is couched in the following language:

"PROVISIONS AS TO CONVERSION OF INSURANCE ON INSURED CHILDREN—If any insurance on the life of an Insured Child shall terminate as a result of such child attaining the age of 25 while this policy continues in force other than as reduced paid-up insurance or extended term insurance, or if any insurance on the life of an Insured Child, issued as a result of the death of the Insured, shall terminate for such reason, such insurance may be converted without evidence of insurability, subject to the following provisions and conditions:

(1) Proper written application for the converted policy, accompanied by payment of the first premium thereon, must be made to the Company at its Home Office not earlier than 31 days prior to, and not later than such termination on the 25th birthday of such child. The date of issue shall be the 25th birthday of such child.

(2) The converted policy will become binding upon the Company only if the child to be insured under such policy is living on its date of issue.

(3) The converted policy will be on any one of the forms then customarily issued by the Company on the non-participating plan providing for a premium during the first policy year at least as great as that required for a Whole Life policy with the same initial death benefit (subject to the Company's standard minimum amount requirements with respect to any particular policy form), of an amount not less than one times and not more than five times the Sum Insured on such child. Premiums on the converted policy will be payable annually, semi-annually, quarterly or monthly, as elected, at the Company's regular premium rate charged for such a policy at its date of issue for the then attained age of such child.

(4) The converted policy will include such provisions as are regularly included in new policies on the same plan bearing the same date of issue, except that the converted policy shall not provide for any Accidental Means Death Benefit, Waiver of Premium Benefit or Loss of Eyesight or Limb Benefit unless agreed to by the Company subject to such requirements as it may make at the time of conversion.

If an Insured Child is entitled to a converted policy as provided above but dies during the 31 day period within which such policy may be applied for and before the date of issue of such policy, the Company will pay a death benefit under this policy as provided in this policy and shall have no liability under the converted policy applied for other than a refund of any premiums paid thereon."

Record at 24. The policy also contained the following suicide clause:

"Suicide—If the Insured or the Insured Wife shall die by his or her own hand or

act, whether sane or insane, within two years from the date of issue of this Provision, this Provision shall terminate in its entirety, and the amount payable in lieu of all other benefits under this Provision shall be limited to the premium or premiums paid hereunder without interest. If an Insured Child shall die by his or her own hand or act, whether sane or insane, within two years from the date of issue of this Provision, no amount will be payable."

Record at 26.

Gary became twenty-five years old on February 9, 1978. He did not apply for insurance under his conversion privilege, however, until February 20, 1978. Nevertheless, the date of issue of his converted policy was February 9, 1978. Gary's new policy contained the following incontestability and suicide provisions:

"INCONTESTABILITY—This policy shall be incontestable after it has been in force during the lifetime of the Insured for two years from its Date of Issue, except for nonpayment of premiums and except for any provisions relating to benefits in the event of total and permanent disability and for provisions granting additional benefits specifically for death by accident."

"SUICIDE—Suicide of the Insured, whether sane or insane, within two years from the Date of Issue is a risk not assumed under this policy, and in that event the liability of the Company shall be limited to the payment of a sum equal to the premiums paid less any indebtedness."

Record at 31. It also provided:

"THE CONTRACT—This policy and the written application, a copy of which is attached at issue, constitute the entire contract. All statements in the application will, in the absence of fraud, be deemed representations and not warranties. No statement will void this policy or be used to defend a claim unless the statement is contained in the written application.

No alteration of this policy and no waiver of any of its provisions shall be valid unless made in writing by the Company and signed by the President, a Vice-President, the Secretary, or an Assistant Secretary of the Company."

"DATE OF ISSUE—The Date of Issue is stated on Page 3 and will be used in the interpretation of the Incontestability and Suicide provisions of this policy."

*Id.*

On September 6, 1979, Gary committed suicide, and Roy submitted his claim. Commonwealth denied liability for the benefits citing the two year suicide clause in Gary's individual policy and sent Roy a check for $164.35, the amount of premiums Gary had paid. Roy did not cash the check and brought this action for the proceeds of the policy contending that the two year suicide clause had been satisfied. Commonwealth tendered a check for the amount of the premiums paid to the clerk of the court. Both parties moved for summary judgment upon uncontested facts. The court granted summary judgment in Roy's favor for $5,000, the policy benefits, plus costs.

## ISSUE

On appeal Commonwealth questions whether or not the trial court's construction of the language in the insurance policy is contrary to law.

## DISCUSSION AND DECISION

Commonwealth contends that the language in Gary's policy, as well as that in the conversion clause, is clear and unambiguous. Roy argues that the language in the conversion clause is ambiguous and can reasonably be interpreted to mean that no suicide clause would be required in the new policy. Roy also asserts that in Indiana, as well as in other jurisdictions, a conversion clause in an original insurance policy governs the interpretation of the suicide clause in the new policy. Both parties rely on the case of *Western & Southern Life Insurance*

*Co. v. Shelby*, (1935) 101 Ind.App. 1, 194 N.E. 197, *trans. denied.*

*Western* involved conversion of a term insurance policy to a whole life policy. The original term policy contained the following provisions:

" '1. This policy and the application therefor, a true copy of which is endorsed hereon or securely attached hereto, constitute the entire contract between the parties, and shall be incontestable after two years from its date, except for nonpayment of premiums.

\* \* \* \* \* \*

" '5. In case of self-destruction *within two years from the date on which this insurance begins*, whether the insured be sane or insane, the amount of Insurance under this policy shall be the amount of premiums paid thereon.

" 'CONVERTIBLE—If this policy is legally surrendered to the Company at any time within 4 years from its date while in full force and before any default in payment of premium, and before the insured has attained the age of 50 years, it may at any anniversary of its date upon written application of the insured, be exchanged, without medical examination, for any level premium Life or Endowment policy then being issued by the Company, for an amount not exceeding that insured by this policy, but not including any Disability Insurance or Double Indemnity or any hazard not specifically covered by this policy.

" 'Such new policy shall, at the option of the insured, either: First, bear the date of issue and age of the insured at the time of such exchange and provide for the payment of annual level premiums thereon at the rates then charged by the Company for such insurance at the then attained age of the insured, or; Second, bear the same date of issue and age of insured as this policy and provide for the payment, after such exchange, of annual level premiums for such insurance

at the rates charged by the Company at the time of conversion for such Insurance at the age of insured at the issue of this policy, provided, however, that the insured may select this second option only upon payment to the Company of the differences between the premiums theretofore paid hereon for an amount of insurance equaling that of the new policy and the premiums that would have been required under the new policy, had it been issued at the date of this policy, with five per cent interest per annum compounded.

" 'Such exchange can be effected only in the manner herein provided.' (Our italics.)"

101 Ind.App. at 3–4, 194 N.E. 197. The insured executed the following "Request for Change of Policy" which the company granted:

" 'The Western & Southern Life Insurance Company of Cincinnati, Ohio, is hereby requested to make the following change in Policy No. 322837–A: from five year term to commercial whole life at age 43, *by alteration or indorsement of original Policy or by issuing new policy of same number and date in place thereof; the statements and agreements in the application for the original Policy to remain in full force and to apply to new Policy.* Dated at Lebanon, Indiana, August 9, 1930.' " (Emphasis ours.)

101 Ind.App. at 4, 194 N.E. 197.

The court noted that the general conditions of the whole life policy were in the same language as those contained in the original term policy and that the question of whether the two policies form a single contract was one of first impression in Indiana. The court summarized the case law from other jurisdictions which had been relied upon by the parties, resolving any apparent conflict among the cases by saying that such was not the result of conflicting principles of law, but rather of the application of the same principles to different facts in each case. In affirming the trial court's

judgment in favor of the beneficiary of the policy, this court concluded:

> "The facts in the instant case, in all their essential characteristics, are closely analogous to those in the *Silliman* and *Aetna Life Insurance Company* cases, *supra*,[1] and the reasoning of the courts in those two cases, from which we have quoted at length, are especially applicable to the facts here, and without further extending this opinion for the purpose of incorporating therein any additional reasons, if it were possible to present them, we hold that the phrase, 'In case of self-destruction *within two years from the date on which this insurance begins*' (our italics), contained in both policies issued to the insured by appellant, referred to August 17, 1927, the date upon which the five-year term policy began." (Footnote added.)

101 Ind.App. at 16–19, 194 N.E. 197.

Although it is short on reasoning and legal analysis to support its holding, *Western* involved a suicide clause in the second policy which on its face was ambiguous. In *Western*, as in the *Silliman* case upon which it relies, suicide was a limitation on liability if it occurred within a specified number of years "from the date on which this insurance begins." Clearly the question of when the insurance *began* was crucial to determining the company's liability in the face of an admitted suicide. Since the second policy had been obtained upon conversion of an earlier one, the provision could be subject to more than one reasonable interpretation, hence was ambiguous.

In *Aetna Life*, also relied upon in *Western* as an analogous case, the Supreme Court was faced not with the issue of an ambiguous suicide provision but rather with the question of "[w]hether a subsequent contract made in pursuance to the provisions of an earlier one is to be regarded as separate, detached and independent, or as a

continuation and in effect the same. . . ." *Aetna Life Insurance Co. v. Dunken*, (1924) 266 U.S. 389, 45 S.Ct. 129, 131, 69 L.Ed. 342. The court decided a conflict of laws question in favor of Tennessee law and then held:

> "The second policy here was issued in pursuance of, and was dependent for its existence and its terms upon the express provisions of the contract contained in the first one. By those provisions, upon the simple application of the insured, the new policy must issue. Nothing was left to future agreement. The terms of the new policy were fixed when the original policy was made. In effect, it is as though the first policy had provided that upon demand of the insured and payment of the stipulated increase in premiums that policy should, automatically, become a 20-payment life commercial policy. It was issued not as the result of any new negotiation or agreement but in discharge of pre-existing obligations. It merely fulfilled promises then outstanding; and did not arise from new or additional promises. The result in legal contemplation was not a novation but the consummation of an alternative specifically accorded by, and enforceable in virtue of, the original contract. If the insurance company had refused to issue the second policy upon demand, the insured could have compelled it by a suit in equity for specific performance. [Citation omitted.]
>
> "From these premises it necessarily results that the second policy follows the status of the first for which it was exchanged, . . ."

*Aetna Life Insurance Co. v. Dunken*, 45 S.Ct. at 132–33.

In contrast to the *Silliman* and *Aetna Life* cases upon which Roy relies stands the case of *Gans v. Aetna Life Insurance Co.*, (1915) 214 N.Y. 326, 108 N.E. 443, cited in

1.  The full citations for these cases are *Silliman v. International Life Insurance Co.*, (1915) 131 Tenn. 303, 174 S.W. 1131 and *Aetna Life Insur-* *ance Co. v. Dunken*, (1924) 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342.

*Western* and relied upon almost exclusively by Commonwealth. In *Gans* the insured had committed suicide and the insurer denied policy benefits under a policy issued to insured eight months earlier containing the following suicide provision: "If the insured shall commit suicide within one year from the date hereof, while sane or insane, this policy shall be null and void." *Id.* The whole life policy had been issued to the insured upon his application pursuant to the exercise of the second option of certain conversion privileges contained in an earlier term policy. The court explained those options provided by the earlier policy in the following language:

"(a) upon the expiration of the policy it might be renewed and continued for successive terms of five years each, until the insured had passed the insuring age of sixty years, by paying premiums as prescribed by an included table, or (b) upon any anniversary of its date it might 'be exchanged without medical re-examination for a new policy upon any plan then in use by said company on payment of the premium required for such new policy for the insuring age then attained by the insured,' or (c) be exchanged at any time within five years from its date for a then lawful policy of any kind issued April 5, 1907, by the company to be dated April 5, 1907, and issued at the insured's age at that date, on payment of a sum equal to the difference between the aggregate of the premiums then actually paid and the aggregate of the premiums the substituted policy would have earned from April 5, 1907, with interest, provided in either case of exchanged policies 'the premiums required by such new policy shall be paid on the date stipulated for payment of premiums under this policy, that the amount of insurance shall not be increased or the premium rate be less than required by this policy, and that application for such new policy be made and this policy returned' to the company before a default in premium and before its expiration. This term policy contained a suicide clause identical with that already quoted."

*Id.* The question then posed by the court was whether or not the two policies formed a single contract thus rendering the suicide clause inoperative. Its analysis proceeded as follows:

"The intent of the insured and the company existing April 5, 1912, as expressed binds and obligates both of the parties. Presumptively, their intent is expressed by the natural and ordinary meaning of their language referable to it and such meaning cannot be perverted or destroyed by the courts through construction. Where the parties by their words have left no fair reason for doubt, there is no just or defensible excuse for construction. *Dwight v. Germania Life Ins. Co.*, 103 N.Y. 341, 8 N.E. 654, 57 Am.Rep. 729; *Thompson v. Craft*, 238 Pa. 125, 85 Atl. 1107; *Foot v. Aetna Life Ins. Co.*, 61 N.Y. 571; *Kratzenstein v. Western Assurance Co.*, 116 N.Y. 54, 22 N.E. 221, 5 L.R.A. 799. The application of this principle to the present case justifies the decision of the Appellate Division.

"The policy in suit is dated April 5, 1912, and in it the insured and the defendant said:

'If the insured shall commit suicide within one year from the date hereof, while sane or insane, this policy shall be null and void.'

"This is a rigid and certain agreement from which no doubt or hesitation as to its meaning can spring. They also said:

'This policy and the application herefor constitute the entire contract between the parties hereto. * * *'

"It is and must be conceded that there is no language or stipulation within the policy or the application for it which conflicts with or affects the stipulations above quoted. A reference to the application in consideration of which the policy was issued is a strong confirmation of the integrity of those stipulations. It applies for a 'new contract or policy,'

specifying the kind desired. The policy of April 5, 1912, is in form and substance an independent, complete and isolated contract. It expresses no dependence on or connection with the term policy. Nor was it a restatement of the contents of the term policy. The premium to be paid, and the rights, privileges, advantages and obligations of both parties under it are essentially and substantially different from those under the term policy. The contents of the policy do not disclose or suggest a reason why the plain meaning of the stipulations should be ignored or nullified.

"The appellant asserts as a reason for such action that either of the options of the policy of April 5, 1907, which the insured did not exercise would, if exercised, have made April 5, 1907, the date of the present policy, and, therefore, the option which the insured did exercise and which expressly made the date of the present policy that of its issuance, should be, through construction, rewritten by the court, so as to provide that the date of the new should be that of the old policy. Beyond skepticism, the parties agreed that the date of the new policy should be that of its issuance, and they so made it; that the old policy should be returned to the company and thereby terminated; that the premium payable was adapted to the kind of new policy selected by the insured and to his then insuring age, and should be paid 'during the whole term of the policy,' and that the term of the policy should be 36 years from April 5, 1912. We have not the right or power to compel the parties to do that which they agreed should not be done."

108 N.E. at 444.

Where an insurance policy has been issued upon the exercise of a conversion privilege courts may ignore as in *Western*, or specifically eschew, as in *Founders Life Assurance Co. of Fla. v. Poe*, (1978) 242 Ga. 748, 251 S.E.2d 247, the requirement of ambiguous language in the current policy before proceeding to the question of whether a subsequent policy is to be regarded as a separate and independent contract or as a continuation of an earlier one. The general rule with respect to the efficacy of suicide clauses in converted policies has most recently been summarized in *Founders Life*.

"It is generally held that when a policy of life insurance is canceled or surrendered and replaced by a new agreement, the new policy does not create a new contract of insurance, but effects a continuance of the original contract so that the liability of the insurer for death by suicide is not affected by the fact that death occurred within the period specified in the new policy's suicide clause. If the new policy is so different as to constitute an entirely new agreement the original suicide clause is inapplicable; but where the latter is identical or at least substantially similar to the old policy, it is usually held that the policies should be considered as one agreement. See 1 Appleman, Insurance Law and Practice, § 369 (1965); 9 Couch on Insurance § 40:52 (2d Ed. 1962); Anno., Insurance—Suicide Clause—Reinstatement, 98 A.L.R. 344 (1935); Anno., Suicide Clause-Inception of Risk, 37 A.L.R.3d 933 (1971)."

251 S.E.2d at 249. Other cases which apply this rule are *Binkley v. Manufacturers Life Insurance Co.*, (10th Cir. 1973) 471 F.2d 889, *cert. denied* 414 U.S. 877, 94 S.Ct. 130, 38 L.Ed.2d 122; *Moore v. John Hancock Mutual Life Insurance Co.*, (5th Cir. 1971) 436 F.2d 823; *Ownbey v. General United Life Insurance Co.*, (1974) 34 Colo.App. 33, 524 P.2d 636; *Occidental Life Insurance Co. of North Carolina v. Hurley*, (1974) Tex.Civ. App., 513 S.W.2d 897; *Massachusetts Mutual Life Insurance Co. v. Thacher*, (1961) 15 A.D.2d 242, 222 N.Y.S.2d 339, (Rabin, J., dissenting); *Baugh v. Metropolitan Life Insurance Co.*, (1938) 173 Tenn. 352, 117 S.W.2d 742; *Morse v. General American Life Insurance Co.*, (1935) 130 Neb. 37, 263 N.W. 676. *See also*, 1 Appleman, Insurance Law and Practice § 126 (rev. ed. 1981) and 1B Appleman, Insurance Law and Practice § 499 at 381–84 (rev. ed. 1981).

Results reached under application of this rule, however, are not always consistent and depend to a great extent, on the unique facts and circumstances of each case. For example, in *Provident Life and Accident Insurance Co. v. Kegley*, (1957) 199 Va. 273, 99 S.E.2d 601, Claude Kegley's life was insured for $1,000 under a group policy by his employer. The policy contained the following conversion provision:

"'Conversion—Upon termination of insurance under the group policy, because of termination of employment with the Employer, any Employee shall be entitled to have issued by the Insurance Company, without medical examination, a policy of life insurance in any one of the forms customarily issued by the Insurance Company, except term insurance, upon written application made to the Home Office of the Insurance Company within thirty-one days after the termination of employment and upon payment of the premium applicable to the class of risk to which the Employee belongs and to the form and amount of policy at the Employee's then attained age. Any individual policy issued in accordance with this provision shall become effective at the expiration of the thirty-one day period during which the Employee was entitled to make application for the individual policy. The amount of the individual policy shall not exceed the amount of the Employee's life insurance in force at the beginning of such thirty-one day period.'"

99 S.E.2d at 602. Kegley's employment terminated, and by written application he applied for and was issued a conversion of his death benefit under the group policy to an individual life policy of $1,000 on the endowment at 85 plan. This policy had the effective date of November 2, 1954, and contained the following suicide clause: "If the Insured shall die as a result of suicide, whether sane or insane, within two years from the Effective Date of this policy, the amount of insurance payable shall be limited to the premiums paid in cash for this contract.' See Code, § 38.1–437." 99

S.E.2d at 603. Kegley committed suicide in less than six months from the effective date of the policy and the company tendered the beneficiary only the amount of the premiums paid under the policy. Beneficiary brought an action contending that the policy sued on was merely a continuation of the insurance provided by the group policy. The appellate court held that

"[b]y no valid method may this policy be construed as a continuation of the group policies and the certificate of February 1, 1953, which provided for life insurance, accidental dismemberment and disability benefits as well as family funeral benefits only during the time that the insured continued in the employment of the coal company. As stated, his employment terminated and the insurance under the group policies terminated at the same time. Within thirty-one days after that termination date he could, if he wished, apply for and have issued to him, without medical examination, a new policy in any one of the forms customarily issued by the company, upon payment of the applicable premium. On his application there was issued to him the type of policy for which he applied, for which he paid a different rate of premium, which contained different terms and which covered only one of the risks embraced in the group policies. This was a new and different contract and it must be construed according to its terms.

\*　　\*　　\*　　\*　　\*　　\*

"It was likewise plainly written in the policy on which this suit is based that if the insured committed suicide within two years from the effective date of that policy, which was November 2, 1954, the amount of insurance under the policy was limited to the premiums. This is clear language. There is no ambiguity, and we cannot use the office of construction to make for the parties a contract different from the one they made for themselves. The judgment here can be for no more than the parties agreed the defendant

should pay, being the total of the premiums, which sum it has tendered to the plaintiff."

99 S.E.2d at 604, 605–06.

On the other hand, in *Occidental Life Insurance Company of North Carolina v. Hurley*, (1974) Tex.Civ.App., 513 S.W.2d 897, the facts are somewhat more similar to the case at bar. In *Occidental Life* Laura Hurley's life was insured for $1,000 by virtue of a rider attached to the $5,000 life insurance policy of her mother. The rider on the original term policy contained the following conversion provision:

" 'CHANGE IN PLAN: On the Policy Anniversary nearest the twenty-first birthday of an Insured Child or at the end of the premium paying period under the base Policy, whichever date is the earlier, the coverage under this Agreement on the life of an Insured Child may be exchanged without further evidence of insurability for a new Policy for an amount equal to five times the Amount of Insurance in force on the life of such Insured Child. The new Policy shall be issued as of the date of exchange and may be on any life or endowment plan then being issued by the Company, provided that premiums thereon are payable for a period of not less than ten years, and that the face amount shall not be less than the published minimum for the plan of insurance applied for. The premiums charged shall be determined in accordance with the Company's rates then in effect for the attained age of the Child Insured on the date of exchange. Any such exchange will be effected only upon receipt of a written request therefor, which request must be made within the thirty-day period preceding the date of such exchange. Such written request if made during the lifetime of the Insured shall be signed by the person who is entitled to exercise the rights and privileges under the Policy. If such written request is made after the death of the Insured, it shall be signed by the Child who is to be Insured under the Policy.' "

513 S.W.2d 898. While the base policy contained a two year suicide clause affecting the "Insured," the rider made no mention of suicide. The rider did distinguish, however, by definition between "Insured" and "Insured Child." Shortly after her twenty-first birthday Laura applied for a $5,000 double indemnity permanent life insurance policy under the "Change of Plan" clause of the rider. The insurer refused this request because of Laura's health but issued instead a $5,000 permanent life insurance policy which contained a suicide clause identical to that in her mother's original policy. Laura committed suicide less than two years after the policy had been issued, and the insurer denied full benefits, paying only the amount of the premiums into court. In holding that the suicide provision was conditioned upon the agreement evinced by the original policy and that it should not be construed independently of the original policy, the court reasoned as follows:

"In the instant case, the procedure for exchange is set out in the term rider and the rights, obligations and liabilities are fixed by the term rider. It is unquestioned that the latter policy was issued pursuant to the terms of the prior agreement and that the procedures and conditions thereof were followed. It is further evident that the parties contemplated that the conditions be followed, and that the insurer was bound to issue the latter policy. The insured attempted to deviate from the conditions by requesting double indemnity coverage and the insurer refused on the ground of unacceptable health. It would then appear that insured was, at the time of the exchange, an unacceptable risk and the insurer issued only that coverage that it was bound to issue under the fixed conditions in the prior term rider, evidencing that it was not contemplated that either party was required to enlarge its obligations or diminish its rights under the latter policy issued pursuant to the basic agreement.

"From an examination of the 'Change in Plan' provision in the term rider it is

apparent that the insurer is obligated to issue a policy without further evidence of insurability. The type of policy issued is to be any life or endowment plan being issued at the time of the exchange. The amount of the new policy is to be five times the amount in force ($5,000), and the premium determination is also set forth. It was stipulated that the new policy was issued in accordance with the terms of the rider. Therefore, in our opinion, the rights, obligations, and liabilities of the parties were fixed by the prior contract and effectuated by the exchange."

513 S.W.2d at 900. The court then reasoned that even though the benefits of the second policy varied from those under the term policy, the significant factor was that the rights to the additional benefits had been fixed by the original policy and consequently the latter policy was but a continuation of the former. The court concluded:

"Since it appears that the second policy covering Laura Hurley relates back to and is not independent of the first, then, in view of the very nature and obvious purpose of a suicide clause, the insurance company is not entitled to avoid liability under a two year suicide clause which was included in the converted policy issued approximately six years later pursuant to the original agreement."

513 S.W.2d at 901.

In the case at bar it is clear that the second policy was dependent on the first for its existence. The form upon which Gary made application was one provided for the purpose of exercising a conversion privilege. It contained no question relating to insurability or physical examination but did contain a section to be filled in if the offer for additional insurance were declined. Even though Gary did not apply for his policy until February 20, 1978, Commonwealth listed the date of issue of the new policy as February 9, 1978. By waiving the time period during which the conversion privilege could be exercised Commonwealth led Gary to believe that coverage under the previous policy would be continuous, a benefit which would not be compatible with reimposition of a two year lapse in the event of suicide.

■ Suicide clauses have been seen to serve two separate purposes, (1) as a risk of loss provision upon which premiums of the policy are based, *Kunse v. Knights of the Modern Maccabees*, (1909) 45 Ind.App. 30, 90 N.E. 89, or (2) as an anti-fraud provision, *Silliman v. International Life Insurance Co.*, (1915) 131 Tenn. 303, 174 S.W. 1131. When suicide is provided by the policy as an exclusion for a relatively short period of time, it is viewed more in the nature of an anti-fraud provision, preventing a party from taking out an insurance policy and shortly thereafter committing suicide, rather than as a clear cut risk of loss exclusion. As a result of this interpretation, short term suicide provisions are frequently confused with incontestability clauses. *See e.g., Fisk v. Security Life & Trust Co.*, (8th Cir. 1978) 575 F.2d 1242; 1B Appleman, Insurance Law and Practice § 499 (rev. ed. 1981); 9 Couch on Insurance § 40:64 (2d ed. 1962); Muhr, *Life Insurance and Suicide: History and the Colorado Statute*, 41 Denver L.C.J. 51 (1964). Clearly suicide may be properly excluded as a risk of loss. *Kunse v. Knights of the Modern Maccabees, supra.* Even though in Indiana suicide clauses and incontestability provisions are to be regarded as separate and distinct, such is the case because they possess different purposes. *Prudential Insurance Co. of America v. Rice*, (1944) 222 Ind. 231, 52 N.E.2d 624. If the function of the short term suicide clause is merely to serve as an anti-fraud provision and not as an excluded risk of loss upon which premiums are proportionately based, then it would be only logical that where evidence of insurability is waived and where a party is led to believe he is effecting a conversion of earlier established benefits rather than purchasing an entirely new policy the suicide clause of the second policy would not be given effect. *See Moore v.*

*John Hancock Mutual Life Insurance Co.,* (5th Cir. 1971) 436 F.2d 823. "Deodands are repugnant to American ideas of justice and have never been recognized by the common law of this country." *Prudential Insurance Co. of America v. Rice,* 222 Ind. at 238, 52 N.E.2d 624. "Courts will construe a contract of insurance liberally, so as to give it effect rather than to make it void. Conditions which create forfeitures will be construed most strongly against the insurer. Only a stern legal necessity will induce such a construction as will nullify the policy." *Northwestern Mutual Life Insurance Co. v. Hazelett,* (1886) 105 Ind. 212, 216, 4 N.E. 582.

 Under the law of Indiana and other jurisdictions as well as the facts of this case we find that the trial court did not err in entering judgment for Roy.

Judgment affirmed.

ROBERTSON and YOUNG (by designation), JJ., concur.